**JONES v. UNITED STATES.**

No. 11851.

United States Court of Appeals
Ninth Circuit.

June 20, 1949.

Warren A. Taylor, Fairbanks, Alaska, for appellant.

Harry O. Arend, U. S. Atty., Everett W. Hepp, Asst. U. S. Atty., Fairbanks, Alaska, for appellee.

Before MATHEWS, HEALY and POPE, Circuit Judges.

POPE, Circuit Judge.

Appellant, Leon W. Jones, was tried and convicted in the district court of the Territory of Alaska on two indictments, each charging murder in the first degree. The two cases were consolidated for trial. In one case the killing charged was of Carl Oscar Ahnstrom; in the other, of Donald R. Harris. The verdicts found appellant guilty of murder in the first degree in each case, "but without capital punish-

ment". Under the Alaska Criminal Code such a verdict made a sentence of life imprisonment mandatory,[1] and judgment was entered accordingly.

On this appeal it is urged: (1) that the verdicts were contrary to the evidence in that it was proven that defendant was so intoxicated he was incapable of the deliberation and premeditation required for first degree murder; (2) that the evidence, largely circumstantial, was insufficient to convict; and (3) that the court erred in denying appellant's motion for new trial on the grounds of newly discovered evidence.

The homicides took place at some time during the evening or night of Sunday, July 20, 1947. On that evening Donald R. Harris, one of the victims, hired the government witness, Therriault, to take Harris and the appellant Jones in Therriault's automobile from their construction camp at Big Delta, Alaska, on the Alaska Highway, to a place some thirty miles distant and along the highway where it crosses the Little Gerstle River. At that place Therriault found two cabins and stopped his car near the one nearest the highway which was that of Ahnstrom, the other victim. Harris and Jones got out of the car and went to the second cabin some 57 feet beyond the Ahnstrom cabin. The second cabin was occupied by an Indian family. The two men went in and talked to the Indians there while Therriault, who had promised to wait an hour for them, sat in the car and talked to Ahnstrom, who stood near the car during the entire time Jones and Harris remained in the Indians' cabin, about 40 minutes.

On the trip from the construction camp Jones and Harris had stopped at a roadhouse, and had been drinking from a coca cola bottle, on the trip, but whether they had then been drinking intoxicating liquor Therriault did not know. When they entered the Indians' cabin they carried in whiskey—Therriault said one bottle, the Indians said two,—and they drank while they were in the cabin, where the Indians, Frank Felix and his wife, and their small children, were. Felix and his wife both

---

[1] Compiled Laws of Alaska 1933, Sec. 4758.

testified, but not too intelligibly on account of language difficulties. It appears from their testimony that the two men were, or became quite drunk, and were asked to leave the cabin, and as they did so they came out "scuffling". Jones appeared to be chasing Harris, who fell, then got up, and they started running and scuffling again, exchanging blows, "but none were very hard blows." Therriault went to Jones and suggested they return to camp. Jones told Therriault to mind his own business. Thereupon Therriault left and drove back to the construction camp. As he left Ahnstrom was still standing near his own cabin.

This was the last time either Harris or Ahnstrom was ever seen alive by any government witness, for the Indian family, who had also witnessed the scuffling, had become alarmed and gone to an Indian tent camp occupied by some other natives some three quarters of a mile distant through the timber.

After some time Mrs. Felix, with another Indian woman returned to the Felix cabin to get food and clothing for the children. There they found the dead body of Carl Ahnstrom, lying face down, near the Felix cabin. From the brush near the Ahnstrom cabin they heard sounds which they described as the sound of a man dying,—a long drawn-out, vocal "ah". They did not see Harris, but did see a man whom one of them identified as Jones walking back and forth on the highway bridge over the Little Gerstle, "hollering" and throwing stones at the bridge. The women hurriedly left and with all the Indians went to a trading post 4½ miles distant where they reported the homicide.

When the officers arrived, about 2:30 in the morning, they found the body of Ahnstrom lying face down near the Felix cabin. There were two deep wounds in his back, cut through his shirt, apparently by an axe. There were superficial wounds on the neck and head, but death was due to the deep back wounds which penetrated both lungs. Spread over Ahnstrom's back was an extra khaki shirt. This shirt was identified as one Jones was wearing the evening before. Although Ahnstrom was a pipe smoker, an unopened package of

Camel cigarettes lay on the ground in the crook of his arm. Jones had brought Camel cigarettes the day before.

The body of Harris lay face up near the Ahnstrom cabin. About three feet away lay a bloody double-bitted axe, identified as one owned by Ahnstrom and which he usually kept in a stump near the cabin. Harris' neck had been chopped open. The wound had severed the great blood vessels and the spinal cord in such a manner as to cause instant death and to make utterance of audible vocal sounds impossible. There was also a wound about six inches in length on the right side of the body at the level of the collar bone and the sternum which extended through the skin and muscles but not into the lung cavity. There were many other superficial abrasions, and a fractured nose. A Camel cigarette was between his lips, bloody where it touched the lips, and slightly burned on the end. Near the body of Harris lay the frame and broken glass of eye-glasses which Jones afterward identified as his.

Across the river from the Ahnstrom cabin, near a valve box of the Canol pipe line, the officers found some clothes scattered about. The clothes belonged to Merle Marie, a native man, with the exception of a pair of brown pants which were identified as having been those worn by Jones the previous day. Jones' watch, key and handkerchief were in the pants pockets. The lower portion of the pants were wet and covered with silt as if they had been worn by one wading the stream. Tracks noted near the valve box were followed down the road to the same Indian camp to which the Felix family had first gone. The officers found no persons there but found a number of empty .22 rifle cartridge boxes. They followed tracks from this Indian camp along a trail to the river, finding various articles scattered about. Near the camp were four dead dogs recently shot where they were chained.

Jones was apprehended on the highway where he came out seeking clothing and food after hiding in the brush for ten days. He had a blanket and a .22 rifle. Both were identified as having been taken from the Indian camp where the .22 cartridge boxes were found. When he was picked

up he gave some name other than his own. Later he told the officers who he was, where he had been during his flight, told about being with Harris in the Felix cabin, but said he had no recollection of what happened after that until he woke up the next morning and discovered the bodies. He said "I don't deny that I killed them. I don't know how. * * * I must have, because I left and went into the brush. Otherwise, why would I have left and run?"

Blood specimens taken from the bodies of the two men killed were found putrified, and could not be analyzed, but blood samples from the clothing of the two men indicated that the blood of Harris belonged to Group A, and that of Ahnstrom to Group O. Blood on the axe was from both groups. Jones' blood also was Group O, but the blood on his broken glasses, found near Harris' body, was Group A, as were particles of blood found on the ground between the two cabins and inside the Felix cabin. Jones' shirt, found laid over Ahnstrom's body showed two groups of blood. On the left sleeve, apparently splashed or spurted on, was blood of Group A. On the back of the shirt apparently soaked in was blood of Group O.

Jones testified in his own behalf in general corroborating the government's witnesses as to the events leading up to the time he and Harris were ordered out of the Felix cabin. He said that he met Harris on the day they went to the Little Gerstle at about 11 o'clock in the forenoon. He had never known him previously. They drank beer together most of the day and toward evening Harris arranged for the trip to the Little Gerstle. On the trip, he said they bought two fifths of whiskey, some of which they drank from coca cola bottles. They continued to drink in the Felix cabin. He testified that his mind became a complete blank after they left the cabin until just before sunrise the next morning—about 2:30 A.M., when he came to, lying in the brush outside of the Felix cabin. He had on two pairs of pants and a shirt, none of which he had ever seen before. Beside him was a blanket and a .22 calibre rifle and shells. He walked around and discovered both of the dead bodies. He became panicky and took to the woods carrying the blanket and rifle with him and hid out for about ten days, when he returned to the highway and was apprehended.

Jones testified that on one previous occasion he had "blacked out" for several hours after a drinking party and then learned he had been fighting. It did appear from the government's witnesses that the officers had found a place near one of the cabins where the grass was flattened down as though some one had lain there.

On cross-examination Jones admitted that he had previously been convicted of a crime. He denied positively that he had killed either Harris or Ahnstrom and testified that he had never seen either of them prior to the date in question.

The court instructed the jury with respect to intoxication as follows: "The jury is instructed that: No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition; but whenever the actual existence of any particular motive, purpose, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time in determining the purpose, motive, or intent with which he committed the act." [2]

The court charged the jury with respect to murder in the first degree, murder in the second degree and manslaughter, and defined murder in the first degree in an instruction of which we take notice hereafter.

After the jury had returned its verdict of guilty of murder in the first degree on each charge, appellant moved for a new

[2] It will be noted that this is the language of the Penal Code of Utah quoted in Hopt v. People, 104 U.S. 631, 634, 26 L.Ed. 873. The same language is to be found in the California Penal Code of 1872, Sec. 22, which in turn was taken from Field's Draft, Sec. 17, New York Penal Code, Sec. 22, Penal Law, McK. Consol.Laws, c. 40, § 1220.

548

trial in both cases on the ground, among others, of newly discovered evidence. The motion was submitted upon affidavits to the effect that three years before the homicides Harris had alienated the affections of the wife of Merle Marie, the native man whose clothing was found at the valve box; that the wife had then left with Harris and that Harris and Merle Marie had had a fist fight over the affair at Nenana, Alaska, and that Merle Marie was still vindictive toward Harris.

Counter affidavits on the part of the government were to the effect that at the time of the killings Merle Marie was at George Lake some nine miles distant from Little Gerstle.[3]

We think that the evidence is such that it excludes every reasonable hypothesis other than that of the appellant's guilt. Jones himself thought that he had done the killing,—that is why he fled, and he said as much to the officers when captured. On the left sleeve of the shirt he had been wearing were spots of blood, apparently splashed or spurted on, which corresponded to Harris' blood type. The same type blood was on the broken glasses found near Harris' body and which Jones told the officers were his. Any other conclusion than that Jones did the killing would require a finding that the guilty party removed Jones' pants and shirt, while he lay unconscious, and put two other pairs of pants and another shirt on him. That is as improbable as the suggestion that Merle Marie, or some other of the natives, who were the only persons in the neighborhood, had left a gun and blanket beside the sleeping drunkard, or gone three quarters of a mile away to get a gun (there were guns in Ahnstrom's cabin), or that such a native would have shot the four sled dogs. In our opinion the evidence not only excludes any such hypothesis of guilt on the part of any other person as wholly unreasonable, but points convincingly to Jones as the killer.

It is earnestly contended that appellant could not be found guilty of first degree murder,—that there is lacking sufficient evidence of deliberation and premeditation to sustain such a verdict. Specifically, it is said that Jones was so intoxicated he was incapable of the deliberation and premeditation required.

From the circumstances which the Government was able to piece together it cannot be said that a determination as to just how and why these sanguinary and shocking killings occurred would be free from speculation. There appears to have been a complete absence of motive, there was much evidence of drunkenness on the part of both Harris and Jones, and the killing was accompanied by bizarre and fantastic circumstances, such as placing a cigarette in the dead man's lips, and lighting it, which suggests the goings on of a very drunken person. One who reads the cold record has difficulty in ruling out the possibility that Jones, in his then confused state, catching sight of Ahnstrom's axe, on sudden impulse cut down both of his victims.

On the other hand, there is some evidence that Harris was not killed at the first attack, but that after he lay moaning on the ground, making the outcries described by the Indian women, the killer returned for the purpose of stopping his noise and finished him off. That the axe was last used on Harris is indicated by the fact that it was near his body that it was found. Proceeding on this theory of the circumstances, the jury may have believed that Jones first attacked Harris, perhaps on sudden impulse, that he then attacked and killed Ahnstrom, either to get rid of him as a witness, or because he protested, and that the final attack came when, in order to stop his outcries, Harris was attacked again. If this is what happened, then the facts here would be similar to those in Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382, 166 A. L.R. 1176, where the victim was killed when her attacker returned to stop her "hollering".

---

[3] Merle Marie was not called as a witness. Other Indian witnesses testified he was at Lake George when the killings occurred, although at one point in the testimony, one of these witnesses made the statement Merle Marie had then returned to the Little Gerstle area. The same witness also made the contrary statement when recalled.

At the trial, as before us now, the question of the degree of the homicides was emphasized. It was important that the jury, charged with the duty of determining this issue, be instructed carefully and fully as to what constitutes murder in the first degree. So instructed, we believe it would be for the jury to decide whether the homicides were first degree murder, and we would consider it no part of our function to disturb the finding.

But an examination of the court's instructions suggests serious doubts as to whether this jury were enabled to distinguish between first and second degree murder.

The court instructed the jury as to deliberation and premeditation as follows: " 'Deliberate and premeditated malice' is presumed by law to exist where the intention to unlawfully take life is deliberately formed in the mind of the actor, and thereafter such intention is carried out. There need be no appreciable length of time between the formation of the intent to kill and the killing, itself; it may be as instantaneous as successive thought."

A consideration of this charge prompts us to inquire whether the giving of this instruction constituted the type of "plain error" which this court may notice notwithstanding it has not been assigned as error by the appellant.[4] In Bullock v. United States, 74 App.D.C. 220, 122 F.2d 213, the Court of Appeals for the District of Columbia, in holding a similar instruction[5] erroneous, said: "To speak of premeditation and deliberation which are instantaneous, or which take no appreciable time, is a contradiction in terms. It deprives the statutory requirement of all meaning and destroys the statutory distinction between first and second degree murder. At common law there were no degrees of murder. If the accused had no overwhelming provocation to kill, he was equally guilty whether he carried out his murderous intent at once or after mature reflection. Statutes like ours, which distinguish deliberate and premeditated murder from other murder, reflect a belief that one who meditates an intent to kill and then deliberately executes it is more dangerous, more culpable or less capable of reformation than one who kills on sudden impulse; or that the prospect of the death penalty is more likely to deter men from deliberate than from impulsive murder. The deliberate killer is guilty of first degree murder; the impulsive killer is not. The quoted part of the charge was therefore erroneous."

In Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318, 1321, 90 L.Ed. 1382, 166 A.L.R. 1176, also a District of Columbia case, the Supreme Court, holding that there was sufficient evidence there to support a verdict of murder in the first degree, if the accused was a normal man, was careful to point out that "Premeditation and deliberation were defined carefully by the instructions. The contention of the accused that there was no deliberation or premeditation was called distinctly to the jury's attention. The necessary time element was emphasized and the jury was told that premeditation required a preconceived design to kill, a 'second thought.' "[6]

---

[4] Rules 52(b), 54, Rules of Criminal Procedure, 18 U.S.C.A.; Fisher v. United States, 328 U.S. 463, 467, 468, 66 S.Ct. 1318, 90 L.Ed. 1382, 166 A.L.R. 1176.

[5] "The trial judge instructed the jury that, though 'deliberate and premeditated malice' involves turning over in the mind an intention to kill, 'it does not take any appreciable length of time to turn a thought of that kind over in your mind.' " 74 App.D.C. 220, 122 F.2d 213.

[6] The instructions approved by the court contained the following: (Footnote, 328 U.S. at page 469, 66 S.Ct. at page 1321, 90 L.Ed. 1382, 166 A.L.R. 1176) "Deliberation, that term of which you have heard much in the arguments and one of the elements of murder in the first degree, is consideration and reflection upon the preconceived design to kill; turning it over in the mind; giving it second thought.

"Although formation of a design to kill may be instantaneous, as quick as thought itself, the mental process of deliberating upon such a design does require that an appreciable time elapse between formation of the design and the fatal act within which there is, in fact, deliberation.

"The law prescribes no particular period of time. It necessarily varies according to the peculiar circumstances of each case. Consideration of a matter

But the rule for the District of Columbia is not necessarily the rule for Alaska. There is no "federal rule" to be applied here any more than in the District of Columbia. See Griffin v. United States, 336 U.S. 704, 69 S.Ct. 814. As stated by the Supreme Court in the Fisher case, supra, 328 U.S. at page 476, 66 S.Ct. 1318, 90 L.Ed. 1382, 166 A.L.R. 1176, the rule to be applied here is "a matter peculiarly of local concern". It is still a question of the law of Alaska, although this court, sitting some 2000 miles away, is the only court presently charged with the duty of determining that local law. We must make that determination because we must say whether Jones had a fair trial.

There is no question of the propriety of instructing the jury that no particular length of time is necessary for deliberation.[7] As pointed out in a note to Bullock v. United States, supra, such statements are "consistent with the rule that some

appreciable length of time is necessary". When a jury has been correctly informed, as in the Fisher case, of the necessary time element, and of the requirement of a "second thought", it is quite in order to add that no particular time is required.

This is what occurred in Paddy v. United States, 9 Cir., 143 F.2d 847, 853, where this Court, on an appeal from the Alaska court, approved an instruction which contained the statement: "The deliberate purpose to kill, and the act in execution thereof, may follow each other as rapidly as successive impulses or thoughts of the mind; it is enough that the purpose and intent to kill precede the act." However, the same instruction informed the jury that: "The idea of killing must have been conceived and intended before the act which produced death." The jury were not told that idea and act may be "instantaneous", or take "no appreciable time." [8]

In the case of Frank v. United States,

may continue over a prolonged period— hours, days, or even longer. Then again, it may cover but a brief span of minutes. If one forming an intent to kill does not act instantly, but pauses and actually gives second thought and consideration to the intended act, he has, in fact deliberated. It is the fact of deliberation that is important, rather than the length of time it may have continued."

[7] See, for example, the language of the last paragraph quoted in note 6, supra, from the instructions given in Fisher v. United States: "The law prescribes no particular period of time", etc.

[8] If any special significance were to be attached to the particular language used in the Alaska Code in defining the degrees of homicide, we should note that these sections were largely copied from the Ohio statute, and that the case of Shoemaker v. State, 12 Ohio 43, had previously been decided under that statute. There the court instructed that "if the person had actually formed the purpose maliciously to kill, and he deliberated and premeditated upon it, before he performed the act, he was guilty of murder in the first degree, however short the time might have been between the purpose and its execution." The Ohio court approved the instruction because the words "deliberated and premeditated" were allowed to be understood in their natural meaning. That case was said in Burns v. State, 3 Ohio Dec. Reprint 122, to go to "the extreme verge of what the

statute of Ohio will allow." The court there, commenting on an instruction which stated: "Deliberation and premeditation may be accomplished in a very short time—in a moment—so swift is thought," said: "Now in this last clause it is claimed the judge erred, and this court is unanimously of opinion it did."

Because the sections of the District of Columbia Code, whose legislative history is described as "meagre" in a footnote at 328 U.S. at page 482, 66 S.Ct. 1318, 90 L.Ed. 1382, 166 A.L.R. 1176, when first enacted, just two years after passage of the Alaska Code, contained almost the precise words of the corresponding Alaska sections, the District of Columbia decisions were probably dealing with a statute which had the same origin.

The Act of June 4, 1897, 30 Stat. 58, authorized the appointment of a commission to revise the criminal and penal laws of the United States. The commission reported a proposed criminal code for Alaska. Their report called attention to the fact that existing law was lacking in definitions stating degrees of murder, distinguished by the presence or absence of premeditation. Senate Documents Vol. 3, 55th Cong., 2d Session, 1897-98, No. 60. The proposed section defining first degree murder was as follows: "Sec. 3. Whoever, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice, or by means of poison, or in perpetrating, or in

9 Cir., 42 F.2d 623, 630, also from Alaska, this court quoted from an instruction which contained the statement with respect to malice that "It implies premeditation, a prior intent to do the act. It may have existed but for a moment, an inappreciably brief period of time, no longer." The only question respecting this instruction considered by the court was whether the instruction in question referred to both degrees of murder. The propriety of the quoted language was not discussed. We think that this court has not, either by decision or dictum, approved an instruction which, as here, both charged the jury that there need be no appreciable length of time between the formation of the intent to kill and the killing, and that it may be as instantaneous as successive thought.

 It may well be that this statement in the instruction given in Frank v. United States, supra, misled the trial judge. We now expressly disapprove it. Even if this court had previously approved such a statement, a criminal case affords no

proper occasion for the application of the doctrine of stare decisis.

The words "deliberate and premeditated" are not such words of art as to be without meaning to jurors. Left to their own devices, with nothing but the language of the statute to guide them, the jury might be able to appreciate the essential difference between first and second degree murder. But when the court, which might properly advise the jury that no particular length of time is necessary, proceeds to define deliberation and premeditation in terms which lay emphasis upon "no appreciable time", and "instantaneous", the statutory distinctions are rendered meaningless. Deliberation and premeditation were here defined in terms which suggest their absence.

While the instruction given by the court is substantially the same as that frequently approved by the Supreme Court of California,[9] and by the courts of other states,[10] such an instruction has been vigorously criticized in other jurisdictions.[11]

---

attempting to perpetrate, any rape, arson, robbery, or burglary kills another, is guilty of murder in the first degree, and shall suffer death." In the margin of the text the commission referred to "Bates Ann. Ohio Stat. S. 6808" and to three Ohio decisions, including Shoemaker v. State, supra. On March 3, 1899, the proposed sections were adopted and enacted with the insertion of the word "That" preceding the proposed text. 30 Stat. 1253. The same marginal references appear in the first Compiled Laws of Alaska, Thomas H. Carter Compilation, 1900. Two years later, March 3, 1901, the District of Columbia Code was enacted, 31 Stat. 1321, and its sections on homicide so closely follow the language of the Commission's proposed Alaska code as to suggest that the one was copied from the other. The report to Congress on the District of Columbia Code, House Report 1017, 56th Cong., 1st Sess., names Ohio as one of its sources. The Alaska section as originally adopted, and now, reads as follows: "That whoever, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate, any rape, arson, robbery, or burglary, kills another, is guilty of murder in the first degree, and shall suffer death." 30 Stat. 1253, § 3; Comp.

Laws Alaska 1933, § 4757. The District of Columbia section, as originally adopted, is as follows: "Whoever, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate any offense punishable by imprisonment in the penitentiary, kills another, is guilty of murder in the first degree." 31 Stat. 1321, § 798.

[9] People v. Garcia, 2 Cal.2d 673, 42 P.2d 1013; People v. Smith, 15 Cal.2d 640, 104 P.2d 510. The expression appears to have originated in People v. Sanchez, 1864, 24 Cal. 17, 30.

[10] State v. Dong Sing, 35 Idaho 616, 208 P. 860; Sullivan v. State, 47 Ariz. 224, 55 P.2d 312; State v. Hall, 54 Nev. 213, 13 P.2d 624. See cases collected in footnote to Bullock v. United States, supra.

[11] In People v. Guadagnino, 233 N.Y. 344, 135 N.E. 594, 596, the Court was dealing with an instruction which contained the statement: "If there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying a life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow or whether it be contemplated for months. It is enough that the intention

552

It is our opinion that the rule stated by the Court of Appeals of the District of Columbia in Bullock v. United States, supra, is sound, and that the instruction here was erroneous and does constitute plain error.

We agree with the statement of the Court of Appeals of New York in People v. Guadagnino, supra, that where there is some doubt as to the sufficiency of the evidence to warrant a finding of premeditation and deliberation, that situation accentuates and emphasizes such an error as this in the charge of the court. In view of the importance of the whole question as to the degree of homicide in this case, we believe that not only may we notice such plain error, but that it is our duty to do so.

The court left the jury without any means of distinguishing between first and second degree murder. Thus, if the jury in considering the circumstances of the killing of Harris were to disbelieve the testimony of the Indian women as to sounds which they assumed were being made by Harris, as they might well do in view of the extreme difficulty which was experienced in eliciting any testimony from the native witnesses, and were of the opinion that Harris was cut down by Jones on some sudden drunken impulse, the language of this instruction to the effect that no appreciable period of time must elapse and that the intent and the act may be as instantaneous as successive thought, might well lead them to believe

that the court was referring to such a killing. The revolting character of these killings does not diminish our responsibility of care to make sure that the accused had a fair trial. "A shocking crime puts law to its severest test".[12]

We said in Meeks v. United States, 9 Cir., 163 F.2d 598, 602: "Indeed, in view of the fundamental character of these errors we may not affirm, even if we are 'without doubt' of appellant's guilt." As stated in Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 406, 90 L.Ed. 350, from which we then quoted: "In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be." Jones was entitled to have not only his guilt, but the degree of his guilt, determined in that manner.

We believe that the error we have thus noticed operated to deprive the appellant of a fair trial and that in consequence a new trial must be ordered.

Although the decision of the Supreme Court in Griffin v. United States, 336 U.S. 704, 69 S.Ct. 814, removes any possible doubt as to the propriety of this court's review of the trial court's denial of the motion for a new trial on the basis of newly discovered evidence, the disposition

---

precedes the act although the act follows instantly." The Court said: "Even if there be evidence from which the jury would be justified in finding premeditation and deliberation sufficient to make out the crime of murder in the first degree, it was of such a nature that it accentuates and emphasizes any errors which may have been committed upon the trial of the case * * *.

"A design to kill, formed at the instant of the killing, where there is no deliberation and premeditation preceding the act is murder in the second degree, not murder in the first degree. Section 1046 of the Penal Law (Consol.Laws, c. 40). The charge of the court was not clear and distinct upon this very crucial point in the case. If the courts are not clear

and precise in the definition of the law, it cannot be supposed that the jury have drawn the distinctions which the law intends to make."

To the same effect are: State v. Arata, 56 Wash. 185, 105 P. 227, 21 Ann. Cas. 242; State v. Clayton, 83 N.J.L. 673, 85 A. 173; Loy v. State, 26 Wyo. 381, 185 P. 796; State v. Barrett, 142 N.C. 565, 54 S.E. 856; State v. Fenik, 45 R.I. 309, 121 A. 218; Forehand v. State, 126 Fla. 464, 171 So. 241; Torres v. State, 39 N.M. 191, 43 P.2d 929; Simmerman v. State, 14 Neb. 568, 17 N.W. 115.

[12] Mr. Justice Frankfurter, dissenting, in Fisher v. United States, 328 U.S. at page 477, 66 S.Ct. 1318, 1325, 90 L.Ed. 1382, 166 A.L.R. 1176.

which we are obliged to make of this case renders our consideration of that question unnecessary.

The judgment is reversed and the cause remanded for a new trial.