Bernard G. **HOUSE**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 16250.

United States Court of Appeals
Ninth Circuit.

June 1, 1960.

Rehearing Denied June 30, 1960.

Edgar Paul Boyko, Richards, Watson, Smith & Hemmerling, Los Angeles, Cal., for appellant.

William T. Plummer, U. S. Atty., Anchorage, Alaska, George M. Yeager, Howard E. Haskins, Jr., Asst. U. S. Attys., Fairbanks, Alaska, for appellee.

Before ORR, HAMLEY and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

Appellant Bernard G. House was charged in an indictment filed by the Grand Jury in the District Court for the District of Alaska, Fourth Judicial Division, with the crime of murder in the first degree. He was tried by a jury, was convicted of murder in the first degree, and was sentenced to life imprisonment. The conviction and sentence occurred prior to January 3, 1959, the date of the admission of Alaska into the United States. An appeal was timely taken to this Court which has jurisdiction pursuant to 28 U.S.C. § 1291.

The occurrence took place in the early morning hours of May 21, 1957, in a bar in Fairbanks, Alaska, called the "Esquire Club," which was run by a man named Jack Perry and a woman named Eva Beree. The evidence showed that appellant and a friend of his, one Dean Scott, were shaking dice at the bar for drinks and later for money. At one time appellant left the bar to go to his home nearby for the purpose of getting more money. An argument developed between appellant and Scott on one side and the bar owner, Perry, on the other. Witnesses differed as to the cause of this argument, some contending that Perry had objection to the gambling and profanity of the players, and others contending that it arose over the fact that Perry on several occasions had taken a "cut" from the gambling money of Scott and House, to which they had made some objection. In any event, it seems to be agreed that by reason of this argument, Perry drew a pistol and started waving it in front of appellant, telling him to either get out or sit down and drink. The evidence disclosed that appellant said to Perry, "Don't point that pistol at me," and made some threats to "get" Perry. Appellant then left the Esquire Club. There was some testimony that before appellant left, Perry snapped the trigger of the pistol while waving it in appellant's direction, and that Perry refused to let appellant retrieve some of his money which was lying on the bar.

After appellant left, Perry bolted the door from the inside. Within a very brief time of a minute or less, appellant returned and kicked on the door, and Perry yelled, "Don't let him in." Someone, however, unbolted the door and appellant entered the Esquire Club with a 12-gauge shotgun which he had obtained from his automobile parked outside (appellant had just returned from a hunting expedition).

Appellant testified that as he entered the bar he was carrying his shotgun at trail arms. He testified further, "When I walked through the door, Mr. Perry was standing behind the bar with the gun pointing right at me. The first thing, my natural reaction was, I reached up and just took the gun like this and pulled the trigger * * * He had the gun up like that, and when I raised the shotgun he made a movement to get down behind the beer cooler * * * When he turned sideways it was a matter of a flashing second, I pulled the trigger. It caught him I guess in the side." Concerning his intention as he returned to the bar, he testified, "I intended to disarm him if he had the gun on him and at least turn him over to the law, or at least turn him over to somebody, * * *."

The witnesses for the government gave an entirely different version of the affair. Testimony was produced that while House and his friend Scott were shaking dice and gambling at the bar they were arguing back and forth, and were using profanity that could be heard by other persons at the bar. There was testimony that appellant accused Scott of cheating, and that Perry walked down behind the bar to where they were and "told him there was no gambling or cheating in his place, 'either sit down and drink or get out' * * *." Appellant started arguing with Perry and "Perry told him again he was either to sit down and drink or get out; he wanted no cheating or gambling. And Perry pulled a pistol out and he started waving it in front of him and he told him again to get out or sit down and drink, that he would have no cheating or gambling."

Appellant then said, "Don't point that pistol at me." He further used words to the effect "I'll get you—I will get you today or tomorrow—I will get you." Appellant then went out the door, and the door was locked behind him. There was further testimony that one or two minutes later appellant came back and pounded on the door and somebody let him in; that appellant came in with a 12-gauge shotgun, came up to the corner of the bar and fired a shot at Perry. The testimony was further that when the appellant entered the bar, he said, "Now I got you, you s.o.b.," or words to that effect. The government testimony was to the effect that at that time Perry did not have his gun in his hand, but that it was in his pocket, and that after Perry was shot and on the ground, he was then reaching in his pocket trying to pull the pistol out of his right hip pocket.

On this appeal, the appellant claims as error the giving of certain instructions to the jury and the failure to give certain requested instructions.

█ The first two specifications of error complain that included in Instruction No. 12 given by the Court to the jury were the following statements:

"* * * if you are convinced by the evidence beyond a reasonable doubt that the defendant re-entered the Esquire Club with the intention of shooting the deceased, you cannot find that he shot in self-defense * * *."

"The assault with a dangerous weapon made upon the defendant by the deceased before the defendant left the Esquire Club had ended * * *."

The entire Instruction No. 12 which contained the above two excerpts is as follows:

"The assault with a dangerous weapon made upon the defendant by the deceased before the defendant left the Esquire Club had ended, and that assault, though felonious, would not warrant or justify the defendant in reentering the Esquire Club for

the purpose of shooting the deceased. But, if the defendant returned merely to disarm the deceased or to make a citizen's arrest, and he carried the shotgun merely for his own protection or to carry out the disarming of the deceased or to make the arrest, and he actually shot the deceased in self-defense, as defined in these instructions, you must find the defendant not guilty. On the other hand, if you are convinced by the evidence beyond a reasonable doubt that the defendant re-entered the Esquire Club with the intention of shooting the deceased, you cannot find that he shot in self-defense. This means that the rule of self-defense does not authorize one to seek revenge or take into his own hands the punishment of an offender."

A reading of this instruction shows that it clearly and correctly set forth the law. The testimony of all witnesses indicated that after appellant had left the bar, he was not then in any danger. Instruction No. 12, when read as a whole, properly explains the legal position of appellant, including his rights and duties and what he could or could not do when he returned to the bar after being in a place of safety.

■ Appellant also complains of the giving of Instructions No. 5 and No. 15, which read as follows:

"(No. 5) To constitute murder in the first degree, the killing must be accompanied by a clear, deliberate intent to take life. The intent to kill must be the result of deliberation and must have been formed upon a pre-existing reflection and not under a sudden heat of passion or other condition such as precludes the idea of deliberation. The law does not require as an essential element of murder in the first degree that a prescribed or standardized amount of time be used in the deliberation or elapse between the formation of the intent to kill and the act of killing. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder in the first degree.

"(No. 15) Intent may be proved by circumstantial evidence. It rarely can be established by any other means. While witnesses may see and hear and thus be able to give direct evidence of what a defendant does or fails to do, there can be no eye-witness account of the state of mind with which the acts were done or omitted. But what a defendant does or fails to do may indicate intent or lack of intent to commit the offense charged.

"It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. So unless the contrary appears from the evidence, the jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused.

"In determining the issue as to intent, the jury are entitled to consider any statements made and acts done or omitted by the accused, and all facts and circumstances in evidence which may aid determination of state of mind."

Instruction No. 5 was not objected to by appellant at the time of trial, but whether or not appellant made any objection to it, we see no error in it. Appellant in objecting to this instruction now relies on Jones v. United States, 9 Cir., 175 F.2d 544, but his reliance is

misplaced. The instruction complained of in Jones contained entirely different statements and, as appellant admits in his brief, the Instruction No. 5 in this case "does not contain all of the offensive language contained in the Jones case, supra." The only objection taken by appellant to the giving of Instruction No. 15 at the time of the trial is shown in the record as follows:

Mr. Kay: " * * * the only exception I take to the instruction is that on this question of intent the instruction fails to include the testimony of the defendant and I was going to suggest that the very last paragraph at the end of the instruction, in the last sentence, a comma be placed, and the words 'including the testimony of the defendant' be added.

The Court: "I think that is included but not specifically.

Mr. Kay: "I think undoubtedly it is, too, Your Honor * * *."

The instruction complained of was general in its nature, and did not purport to pinpoint the testimony of any witness, including the defendant. In the last sentence the jury was told that it was "entitled to consider any statements made and acts done or omitted by the accused, and all facts and circumstances in evidence which may aid determination of state of mind."

Appellant now on this appeal tries to raise other objections to the instructions which we have considered but in which we see no merit.

The instructions requested by the appellant and refused by the Court are set forth in a footnote.[1] We think these instructions were properly refused by the Court as being inapplicable to the facts of the case, or as covered by the instructions given.

An examination of the entire charge of the Court to the jury reveals that the jury was fully and fairly instructed upon all questions of law pertaining to the crime charged against the appellant.

The judgment is affirmed.

---

[1] Defendant's [Appellant's] Proposed Instructions:

"No. 3. You are instructed that you may take into consideration when determining the guilt or innocence of the defendant the fact that defendant remained at the scene of the homicide and did not attempt to flee or run away.

"No. 4. You are instructed that in determining the existence of actual or apparent danger you are to view the facts from the standpoint of defendant at the time of the killing, taking into consideration the threats made by the deceased against defendant, the reputation of the deceased for violence, if such has been proved, and the language of the deceased just before, and at the time of, the homicide, if such be in proof in determining the guilt or innocence of the defendant.

"No. 5. You may take into consideration the past conduct of the deceased and his prior attitude toward the defendant in determining whether or not he feared he was about to do him great bodily harm or take his life at the time of the incident.

"No. 6. You are instructed that the defendant had a legal right to return to the barroom on the morning of the incident charged, and that if in so doing he placed himself in a position of peril, he was not obliged to retreat but entitled to stand his ground and defend himself with all force necessary to repel his attacker even to the point of taking his life if he had reasonable reason to think and in fact did think he was in danger of great bodily harm or death.

"11. You are instructed that it is not only the right, but the duty of a private person to apprehend or arrest a person who has committed a felony in his presence, either at the time of the commission of the crime or immediately thereafter.

"In this connection, you are further instructed that assault with a dangerous or deadly weapon is a felony under the laws of Alaska, and that a loaded pistol is such a dangerous and deadly weapon.

"12. A person who has been forcibly deprived of personal property has a right to defend that property and demand its return. If, in so doing, an attack is made upon him of such a nature that he is in danger of death or serious bodily injury, then he would have the right to defend himself even to the extent of taking the life of his assailant."