Michael COSGROVE, et al., Appellants,

v.

William French SMITH, Attorney General of the United States, et al., Appellees.

No. 81–1924.

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1982.

Decided Jan. 11, 1983.

---

Joan Hartman,* with whom John L. Pottenger, Jr., New Haven, Conn., of the bar of the Supreme Court of Connecticut pro hac vice by special leave of the Court for the purpose of introducing student counsel, Fred C. Zacharias and Michael Zeldin, Washington, D.C., were on brief, for appellants.

Lisa J. Stark, Asst. U.S. Atty., Washington, D.C., with whom Charles F.C. Ruff, U.S. Atty., Washington, D.C., at the time the brief was filed, John A. Terry, John R. Fisher and Andrea L. Harnett, Asst. U.S. Attys., Washington, D.C., were on brief, for appellees. Kenneth M. Raisler and John Polk, Asst. U.S. Attys., Washington, D.C., also entered appearances for appellees.

Before MIKVA and BORK, Circuit Judges, and DUDLEY B. BONSAL,** Senior District Judge for the Southern District of New York.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Under District of Columbia law, offenders convicted of violations of local law may be assigned by the Attorney General to serve their sentences either in federal facilities or in facilities maintained by the District of Columbia. D.C.CODE ANN. § 24–425 (1981). In 1976, Congress enacted sweeping reforms of the federal parole system. Parole Commission and Reorganization Act, Pub.L. No. 94–233, 90 Stat. 219 (1976). That same year the Federal Bureau of Prisons entered a consent decree in a case involving alleged discrimination in parole standards against female prisoners in federal and local prison facilities, *Garnes v. Taylor,* Civ.No. 159–72 (D.D.C. Dec. 10, 1976). That decree stipulated that all female offenders sentenced in the District of Columbia should be paroled under local, rather than federal, standards, regardless of the site of incarceration or the type of offense, be it D.C. or U.S. Code. On the basis of these two events, male D.C.Code offenders assigned to federal prisons[1] challenge the

---

* Student counsel pursuant to Rule 20 of this Court's General Rules.

** Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. This case originated as a motion for correction of sentence brought by Michael Cosgrove in the District of Columbia courts. The District of Columbia Court of Appeals held that it should be treated as a civil action challenging Cosgrove's classification as a prisoner, *Cosgrove v. United States,* 411 A.2d 57 (D.C.1980), and the United States sought removal to federal district court. Record (R.) 1. An amended complaint was then filed by plaintiffs Michael Cosgrove, James Greenard, Waymond Rice, Robert Robertson, and Hector Rodriguez, all D.C.Code offenders in federal facilities. R. 17, at 2. A motion by the plaintiffs to amend the complaint further and join additional parties plaintiff, R. 26, apparently was never acted on by the district court. The plaintiffs' motion for class certification, with the class to be "all persons convicted and sentenced under District of Columbia laws in the District of Columbia Superior Court, who are subject to parole release determinations by the United States Parole Commission because of their confinement in federal ... institutions," R. 32, also was never acted on by the district court. We are informed by the government that Michael Cosgrove and James Greenard are no longer in federal custody, and hence no longer subject to federal parole guidelines. Government Brief at 1 n. 1. If so, this case is moot as to them. *Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam).

application of the revised federal parole guidelines to decisions on their parole. They allege, first, that the federal scheme imposes different, and harsher, parole standards than the scheme enacted for the District of Columbia and applied to male D.C. offenders assigned to local facilities. They then argue that this treatment exceeds the statutory mandate that the federal parole authorities are to "have and exercise the same power and authority" over D.C.Code offenders assigned to them, as D.C. parole authorities do over offenders assigned to them, D.C.CODE ANN. § 24–209 (1981). They also argue that the alleged differences in treatment, both in terms of D.C.Code offenders assigned to federal prisons and those assigned to local facilities and in terms of male and female D.C.Code offenders assigned to federal prisons, have no rational basis and violate their constitutional right to equal protection of the laws.

The district court granted the government's motion for summary judgment. On the statutory question, it held that the District of Columbia statutory scheme assigns federal authorities plenary authority over D.C.Code offenders placed in federal custody. On the equal protection question, it found that the record did not support the plaintiff's allegations that offenders assigned to federal authorities received harsher parole treatment than offenders remaining with District of Columbia authorities. This holding disposed of the sex discrimination claim. The court went on, however, to hold that, even if a difference existed, the government could apply different parole standards to inmates charged under the same Code offense but incarcerated in different facilities. We reverse.

## I. JURISDICTION

We must first address a threshold jurisdictional problem pressed by the United States.

The district court indisputably had jurisdiction of this case as an action arising under the laws and Constitution of the United States. 28 U.S.C. § 1331 (Supp. IV 1980). The United States contends, however, that the plaintiffs did not timely file their notice of appeal, and that we therefore lack jurisdiction over this case. There is no dispute that the federal rules allow sixty days to notice an appeal when the United States is a party, Fed.R.App.P. 4(a), and that this requirement is jurisdictional, e.g., Browder v. Director, Department of Corrections of Illinois, 434 U.S. 257, 264, 98 S.Ct. 556, 560, 54 L.Ed.2d 521 (1978). The district court granted the government's motion for summary judgment on March 31, 1981, Record (R.) 40, and the plaintiffs' appeal was noticed on August 7, 1981, R. 46—a time lapse which, had it not been for other events, quite clearly would have deprived this court of jurisdiction of this appeal.

On April 10, 1981, however, the plaintiffs had filed another motion, which was not denied until June 10, 1981, R. 45. The plaintiffs' appeal, filed within sixty days, was therefore timely if the April 10 motion tolled the time for appeal. The April 10 motion was styled as a motion for clarification under FED.R.CIV.P. 60(b), which does not toll the time for appeal. Pleadings, however, are to be construed so as to do "substantial justice," see FED.R.CIV.P. 8(f), and the plaintiffs' motion here can fairly be read as a motion to alter or amend the judgment under FED.R.CIV.P. 59(e), which does toll the time for appeal. See Dove v. Codesco, 569 F.2d 807 (4th Cir.1978); Sea Ranch Ass'n v. California Coastal Zone Conservation Commissions, 537 F.2d 1058 (9th Cir.1976); 7 J. MOORE, FEDERAL PRACTICE ¶ 60.29 n. 4 & Supp. (1979). We hold that the plaintiffs' motion was timely under Rule 59(e). It sought both "clarification and certification"—clarification that the judgment had resolved only one portion of the case [2] and certification of that portion

2. In addition to their statutory and equal protection challenges, the plaintiffs had raised a sex discrimination claim, R. 17, at 7, because under a recent decree parole decisions on all female offenders in the District of Columbia are made by the D.C. Board. The sex discrimination claim was not mentioned in the district court's judgment, and the plaintiffs therefore

as ripe for appeal, R. 41. The judgment was in fact meant to resolve the entire case—as the order denying the plaintiffs' motion makes clear, R. 45—and thus what the plaintiffs sought, but misdescribed, was an amendment of the judgment. Finally, relief under Rule 59(e) would have been available to the plaintiffs, for the district court could have amended its judgment to limit it as the plaintiffs hoped. Although the plaintiffs' pleadings here were not artful, they can be construed as falling under Rule 59(e), and therefore tolled the time for noticing the plaintiffs' appeal. The court has jurisdiction of this case, and we turn to the merits.

## II. ANALYSIS

### A. *The District Court's Decision*

There were three crucial steps in the district court's decision. First, the court held that under the relevant sections of the District of Columbia Code, federal authorities were ceded full authority to treat D.C.Code offenders as they treat federal offenders. Second, the court found that District of Columbia and federal standards for parole were the same. As a result, the court concluded, no equal protection difficulties, whether they be between male and female D.C.Code offenders or between male D.C. Code offenders in federal and local prison facilities, were posed by the treatment of D.C.Code offenders according to federal guidelines. We find that none of these decisions properly could be reached at the stage of summary judgment. We reverse so that there may be an amplification of the record, which will allow the district court to determine, and, if necessary, this court to review, the questions raised by this case.

### 1. The Scope of Federal Authority Over D.C.Code Offenders

The statutory framework for the treatment of prisoners in the District of Columbia was established in the 1930's and has not been revised significantly since. Its antiquity is particularly telling because of important, intervening legal changes: the grant of limited home rule to the District of Columbia in 1973, District of Columbia Self-Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973), and the reorganization of the federal parole system in 1976. Difficulties in understanding what the original statutory scheme intended are therefore complicated by the need to accommodate what has come between.

Before the 1930's, decisions about parole for D.C.Code offenders were handled exclusively by federal authorities. The District of Columbia has operated under a bifurcated parole system since 1932, when Congress created the "Board of Indeterminate Sentence and Parole" for the District of Columbia, Act of July 15, 1932, ch. 492, 47 Stat. 696 ("1932 Act").[3] The 1932 Act authorized indeterminate sentencing for offenders convicted of crimes in the District of Columbia, with minimum sentences not to exceed one-fifth of the maximum sentence, or fifteen years in the case of life imprisonment, 1932 Act § 3 (current version at D.C.CODE ANN. § 24–203(a) (1981)). Offenders convicted of offenses committed before the effective date of the 1932 Act were also to be eligible for parole after serving one-fifth of their maximum term, 1932 Act § 9. In conjunction with indeterminate sentencing, the 1932 Act created the Board, with authority to grant parole to prisoners incarcerated in

sought "clarification" that the court had not ruled on the claim, R. 41. The court pointed out, however, that the holding that federal and District of Columbia parole guidelines did not differ obviated the discrimination claim, which was predicated on the assumption that female offenders receive the more favorable parole treatment of the D.C. Board. R. 45.

**3.** The "Board of Indeterminate Sentence and Parole" has since been replaced by the "Board

of Parole," which under the governmental structure of the District of Columbia is now appointed by the Mayor, D.C. CODE ANN. § 24–209 (1981). The change in nomenclature, however, was not accompanied by any changes in the statutory scheme of relevance to this litigation. In this opinion, "Board" or "Parole Board" will refer to the District of Columbia body with authority to parole inmates in District of Columbia facilities.

District of Columbia facilities, 1932 Act § 7, who were eligible for parole by virtue of having served the minimum sentence, and who met statutory standards of parole suitability,[4] 1932 Act § 4, D.C.CODE ANN. § 24–204(a) (1981). Finally, the 1932 Act gave the Attorney General authority to assign prisoners convicted of crimes in the District of Columbia to District of Columbia, federal, or other suitable facilities. 1932 Act § 11 (current version at D.C.CODE ANN. § 24–425 (1981); *see Goode v. Markley,* 195 U.S.App.D.C. 391, 603 F.2d 973 (1979).

But there were anomalies. In 1932, the federal parole statute did not include provision for parole of offenders given indeterminate sentences, as many D.C.Code offenders were under the new statute. Moreover, the federal parole statute authorized release only after an inmate had served a minimum of one-*third* of his sentence, Act of Jan. 23, 1913, ch. 9, 37 Stat. 650, whereas the D.C. Board was permitted to parole an offender who had served as little as one-fifth of his sentence. Prisoners assigned by the Attorney General to federal facilities continued to be subject to federal parole authorities, and thus eligible for parole in some cases considerably later than inmates assigned to District of Columbia facilities. An equal protection challenge to the latter disparity was rejected, *Aderhold v. Lee,* 68 F.2d 824 (5th Cir.1934), but probably triggered an important amendment to the 1932 Act, *see Bracey v. Hill,* 11 F.Supp. 148, 149 (M.D.Pa.), *aff'd,* 77 F.2d 970 (3d Cir.1935). The amendment reads in pertinent part:

> The Board of Parole created by § 723a of Title 18, United States Code, shall have and exercise the same power and authority over prisoners convicted in the District of Columbia of crimes against the United States or now or hereafter confined in any United States penitentiary or prison (other than the penal institutions of the District of Columbia) as is

vested in the District Board of Parole over prisoners confined in the penal institutions of the District of Columbia.

Act of June 5, 1934, ch. 391, 48 Stat. 880 (codified at D.C.CODE ANN. § 24–209 (1981)).

This 1934 amendment, section 24–209, is the statutory provision at the heart of the dispute here. The government contends that the amendment plainly grants federal authorities plenary power over D.C. offenders in federal custody. The plaintiffs argue that the 1934 amendment just as plainly *constrains* federal authorities to apply District of Columbia parole standards to District of Columbia offenders.

Problems in interpreting section 24–209 remained dormant for an extended period, however, because District of Columbia and federal parole practices were virtually identical. In 1940, the District of Columbia parole statute was amended to set eligibility for parole after service of a minimum of one-third of the maximum sentence, thus bringing methods for calculating parole eligibility for D.C.Code offenders nearly into line with those for federal offenders, Act of June 6, 1940, ch. 254, 54 Stat. 242. The only remaining difference was that federal offenders serving a life sentence were eligible for parole after ten years, whereas District of Columbia offenders became eligible only after fifteen years, a difference that remains today. *Compare* 18 U.S.C. § 4205(a) (1976) *with* D.C.CODE ANN. § 24–203 (1981).

With the 1976 revisions of the statutory scheme for parole of *federal* offenders, however, the question of the interpretation of section 24–209 assumed renewed urgency. In 1976, the former United States Parole Board was replaced by a Parole Commission, which was geographically divided in an effort to bring parole decisions closer to inmates and the areas in which they are imprisoned.[5] Procedural protections were

---

**4.** "Parole eligibility" refers to the earliest date an inmate may be considered for parole; "parole suitability" refers to whether the inmate appears to be a good candidate for release into society.

**5.** S.REP. No. 369, 94th Cong., 1st Sess. 15 (1975), U.S.Code Cong. & Admin.News 1976, p. 335.

increased in response to concerns that the earlier system had been arbitrary and secretive.[6] Most importantly for this litigation, the federal standards for parole suitability were extensively revised, *see infra* pp. 16–17. Despite these changes in the federal parole statute (whether the changes were changes of substance is one of the disputes in this lawsuit), section 24–209, in its original 1934 form, remains part of the District of Columbia Code.[7]

■ The scope of the authority conveyed by section 24–209 has thus remained largely unexplored in the courts. It is settled that under section 209, federal authorities may make parole decisions about D.C.Code offenders committed to them, *Beard v. Bennett,* 72 U.S.App.D.C. 269, 114 F.2d 578 (1940); *Story v. Rives,* 68 U.S.App.D.C. 325, 97 F.2d 182, 184, *cert. denied,* 305 U.S. 595, 59 S.Ct. 71, 83 L.Ed. 377 (1938). Whether these decisions are to be made according to federal or District of Columbia standards for parole suitability, however, has never been finally decided.

The legislative history of the 1932 Act and the 1934 amendment, although inconclusive, points toward the interpretation urged by the plaintiffs. The 1932 Act introduced the "modern" penological practice of indeterminate sentencing to the District of Columbia, and sought to relieve federal authorities of the burden of supervising D.C.Code offenders.[8] At the time of the 1932 Act, Congress apparently anticipated that the prison facilities maintained by the District of Columbia at Lorton would be expanded, and that the District of Columbia would in large measure assume responsibility for D.C.Code offenders.[9] When large numbers of D.C.Code offenders continued to be committed to federal custody, however, Congress was troubled by the fact that the federal authorities could not parole offenders serving indeterminate sentences:

> As Congress unquestionably intended [in the 1932 Act] that prisoners convicted in the District of Columbia should be entitled to parole, their confinement in a Federal penal institution, where they are deprived of the benefits of parole, would, therefore, be illegal.[10]

Congress therefore enacted the 1934 amendment, to ensure that the benefits of penological reform which had been provided for D.C.Code offenders did not vanish when the offenders were committed to federal custody. That the 1932 Act adopted a penal philosophy for the District,[11] and that the 1934 amendment was meant to extend the benefits of that philosophy to D.C. offenders in federal custody, suggest that the amendment should not now be read to allow a different, harsher federal standard to be imposed on D.C. offenders in federal hands. But this history is at best suggestive as to the ultimate scope of federal authority over D.C.Code offenders conferred by the 1934 amendment.

Judicial glosses on section 24–209 are similarly inconclusive. At the outset, section 24–209 was read as a limited effort to correct the anomaly that federal authorities could not parole D.C.Code offenders given indeterminate sentences, *e.g., Story v.*

---

6. *E.g.,* 121 Cong.Rec. 15,702 (1975) (remarks of Rep. Kastenmeier).

7. The 1934 amendment, currently codified at D.C.Code Ann. § 24–209 (1981), continues to assign "the same power and authority" over D.C.Code offenders to "[t]he Board of Parole created by § 723a of Title 18, United States Code," although the United States Board has been replaced by the Commission and § 723a is no longer part of the current code. Even a note appended to the most recent edition of the District of Columbia Code, in 1981, indicating that § 723a has been recodified, refers to a section of the United States Code repealed in 1976, *see* D.C.Code Ann. § 24–209 note (1981).

8. *E.g.,* H.R.Rep. No. 881, 72d Cong., 1st Sess. 2 (1932).

9. S.Rep. No. 674, 73d Cong., 2d Sess. 2 (1934) (letter from D.C. Commissioners urging approval of the amendment).

10. *Id.*

11. Legislative materials on the reform of federal parole in 1976 treat the rehabilitative penal theories of 1932 as in turn outmoded, *e.g.,* S. Rep. No. 648, 95th Cong., 2d Sess. 25–28 (1976); 121 Cong.Rec. 15,702 (1975) (remarks of Rep. Kastenmeier).

*Rives,* 68 U.S.App.D.C. 325, 97 F.2d 182, *cert. denied,* 305 U.S. 595, 59 S.Ct. 71, 83 L.Ed. 377 (1938); *Bracey v. Hill,* 11 F.Supp. 148 (M.D.Pa.), *aff'd,* 77 F.2d 970 (3d Cir. 1935). In *Story,* a D.C.Code offender in federal custody, conditionally released as required by federal law, contended that federal authorities could not issue a warrant against him for violating the terms of his release. This court held that because D.C.Code offenses are offenses against the United States, federal authorities did have power to issue the warrant. In rejecting the argument that the 1932 Act deprived the federal authorities of power over conditional release of D.C.Code offenders, the court held that the sole force of the 1932 Act was to grant D.C. authorities the power to *parole* offenders in their custody, and that the 1934 amendment had simply reassigned the District's authority over offenders in federal care. 97 F.2d at 186. The scope of the reassignment was not discussed, however.

■ Later cases do not take a clear position on the interpretation of section 24–209. It is settled that Congress may, with good reason, enact different rules to govern District of Columbia and federal offenders. *Griffin v. United States,* 336 U.S. 704, 69 S.Ct. 814, 93 L.Ed. 993 (1949). Four categories of offenders are in fact relevant here:

(a) D.C.Code offenders in D.C. custody;

(b) D.C.Code offenders in federal custody;

(c) federal offenders in D.C. custody; and

(d) federal offenders in federal custody.

The precise category at issue here, D.C.Code offenders in federal custody, has not been squarely considered, however, and decisions concerning other categories have admonished that a conclusion for one category should not be extrapolated to another category.

In *Gilstrap v. Clemmer,* 284 F.2d 804 (4th Cir.1960), a D.C. offender in D.C. custody claimed that he should be subjected to the more lenient federal method of computing good time deductions, by virtue of the fact that D.C.Code offenses are regarded as offenses against the United States. The court rejected his argument, because it determined that in the case of D.C.Code offenders in D.C. facilities, Congress had exercised its power to create separate, more stringent good conduct standards than those it had created for federal offenders. The Fourth Circuit also inferred that D.C. Code offenders in *federal* custody should, by parity of reasoning, be treated according to D.C. standards, 284 F.2d at 808–09.

In *Howerton v. Rivers,* 117 U.S.App.D.C. 110, 326 F.2d 653 (1963), this court confronted the category of federal offenders in D.C. custody, and held that the 1932 Act had transferred all parole power over prisoners in D.C. custody to D.C. officials—whether the prisoners were D.C.Code or federal offenders. The court distinguished *Gilstrap:*

because the court was there dealing with the question of whether the federal parole law or the D.C. parole law applied to a person convicted under the D.C.Code. Congress presumably can handle these varying situations in varying ways. Although it might be more logical for Congress to prescribe uniformity in the parole treatment of all United States prisoners, whether "D.C." prisoners or "federal" prisoners, it is not urged upon us in this proceeding that it has done so.

326 F.2d at 655. In thus distinguishing *Gilstrap,* the court reiterated the basic problem of this case: Congress may provide differently for any of the four categories of offenders, provided it has good reason for so doing. The reiteration of the problem, however, does not solve it for us. There is no reason to assume that Congress intended the same rationale to be applied to D.C. Code offenders in federal custody that it applies to federal offenders in D.C. custody.

Several recent equal protection challenges to the treatment of D.C. offenders apparently have relied on differing assumptions about whether section 24–209 assigns federal authorities the power to treat D.C. Code offenders by federal parole standards. Because the District has no facilities for long-term incarceration of women, all female D.C.Code offenders serving more than

brief sentences are assigned to federal institutions. Female D.C.Code offenders have argued that their automatic assignment to federal facilities on the basis of sex violates equal protection because it subjects them to more stringent federal parole standards; a premise of this argument is that federal authorities apply their parole guidelines to D.C.Code offenders in federal hands. A suit brought in the District of Columbia courts resulted in a holding that because the federal Parole Board applied stiffer guidelines—the suit was brought before the 1976 reforms, when the former Board was experimenting with the new procedures—section 24–209 was unconstitutional insofar as it applied to women automatically assigned to federal custody. *Williams v. Levi,* No. SP 792–76 (D.C.Super.1976), *reprinted in* Plaintiffs' Appendix (Pl.App.) 91. A suit at about the same time in federal court, challenging a range of features of the treatment of female D.C.Code offenders, resulted in a stipulation by the parties ("the *Garnes* decree") that female D.C.Code offenders were to be referred to the D.C. Parole Board for parole determinations. *Garnes v. Taylor,* Civ. No. 159–72 (D.D.C. 1976), *reprinted in* Pl.App. 115.

There has been one equal protection challenge to the assignment of male D.C.Code offenders to federal custody in the wake of the 1976 parole reforms that has resulted in a written opinion. The challenge was rejected, but not on the basis that section 24–209 assigns federal authorities the power to treat D.C.Code offenders by federal standards. In *Gates v. United States Parole Commission,* Civ. No. 77–136 (M.D.Pa. 1977), *reprinted in* Pl.App. 144, the court held that the new federal standards are substantially similar to the Board's own parole practices, and therefore no equal protection question was posed. In addition,

the court pointed out that section 24–209 probably requires the federal authorities to apply D.C. parole standards in any event:

> Moreover § 24–209 specifically grants District of Columbia Code offenders who are incarcerated in institutions outside of the District of Columbia the same privileges of parole as are accorded to District of Columbia Code offenders committed to institutions within the District of Columbia. By virtue of § 24–209 the Parole Commission is granted only the "same power and authority" over District of Columbia Code offenders who are confined in any United States penitentiary or prison outside of the District of Columbia as is vested in the District of Columbia Parole Board over prisoners confined in the penal institutions of the District of Columbia. See *Bracey v. Hill,* 11 F.Supp. 148 (M.D. of Pa.1935).

Pl.App. 148.

Courts thus have reached no clear consensus about the scope of the authority conferred by section 24–209.[12] The district court's judgment for the government therefore vastly overstated in assuming that it was settled law that section 24–209 conferred on federal officials the power to treat D.C.Code offenders by federal standards. The import of section 24–209 is an open question for us, despite—and complicated by—the fact that the statute is more than forty years old.

We do not believe it proper, however, to resolve the issue of the interpretation of section 24–209 at this stage of the case. Because the district court granted summary judgment, the record is woefully inadequate even on the crucial preliminary issue of whether the new federal parole standards as applied differ significantly from the standards employed by the D.C. Board.

---

12. The government contends that a case from this jurisdiction explicitly holds that D.C. offenders in local custody and D.C. offenders in federal custody may be treated in accord with different parole standards. The case, however, stands only for the more general and unexceptionable propositions that D.C.Code offenders may be subjected to the federal parole authorities and that Congress could set out different methods of treating D.C.Code offenders depending on their situs of incarceration. *Curry-Bey v. Jackson,* 422 F.Supp. 926, 931 (D.D.C. 1976), *aff'd sub nom. Morgan v. Jackson,* No. 75–2127 (D.C.Cir. Dec. 9, 1977) (mem.). It does not hold that Congress has in fact determined in § 24–209 that D.C.Code offenders in federal custody are to be subjected to federal parole standards.

There are in addition possible equal protection difficulties with some interpretations of section 24–209, but the record inadequately explores the questions of fact underlying these issues as well.

### 2. The Federal and District of Columbia Standards for Parole Suitability

The district court also asserted that it was settled that the new federal and the District of Columbia standards for parole suitability are the same. Pl. App. 76. In reaching the conclusion, the court relied squarely on a decision by a district court in Pennsylvania, *Gates v. United States Parole Commission,* Civ.No. 77–136 (M.D.Pa.1977), *reprinted in* Pl.App. 144. *Gates* is not authority that we are bound to follow, and we find that the conclusion that the two standards are the same was prematurely reached.

First, we note that the standards as set out in the current statutes are not the same. Ever since the passage of the 1932 Act, the District of Columbia Parole Board has been authorized to grant parole to D.C. prisoners who have served their minimum sentence and observed the rules of the facilities in which they are incarcerated, upon finding that they appear likely to "live and remain at liberty without violating the law," and that their release will not be "incompatible with the welfare of society," 1932 Act § 4, D.C. CODE ANN. § 24–204(a) (1981). This was the federal statutory standard until the 1976 revision of the federal parole system. The new federal statutory standard, which accepted guidelines that had been employed on an experimental basis for several years before, provides for release:

> if the [Parole] Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:
>
> (1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

> (2) that release would not jeopardize the public welfare . . . .

18 U.S.C. § 4206(a) (1976).

The new standard, moreover, was introduced in the course of congressional consideration of the 1976 Parole Commission and Reorganization Act. The original Senate version of the Act had preserved the earlier standard.[13] The new standard emerged in conference, in the effort to resolve differences between the House and Senate over how much discretion was to be accorded the new Parole Commission. The compromise struck was that the standards set out for the Commission were to be stiffened, and that the Commission was to have discretion to go outside them in particular cases.[14]

The new federal standards are implemented by guidelines promulgated by the Commission. The guidelines assign a "salient factor score" to an inmate, based on personal characteristics such as pre-offense employment history, and rate his crime on an "offense severity scale." Parole recommendations are then based on an intersection of the two ratings, 28 C.F.R. § 2.20 (1981); *see Warren v. United States Parole Commission,* 659 F.2d 183, 191–92 (D.C.Cir. 1981). The District of Columbia Board does not employ similar guidelines in making parole decisions.

Despite these apparent differences, it remains possible that the Commission and the Board in practice employ parole criteria that are substantially the same. The plaintiffs allege that they do not, and that as a group D.C.Code offenders in federal custody receive parole markedly later than D.C. Code offenders in the custody of the District of Columbia. Whether there are differences between the practice of the Commission and the practice of the Board was thus a crucial question of fact at issue, and not capable of resolution on a motion for summary judgment.

### 3. Equal Protection

It is at this stage that the district court's treatment of the two equal protection

13. S.REP. No. 369, 94th Cong., 1st Sess. 18 (1975).

14. S.REP. No. 648, 94th Cong., 2d Sess. 25–28 (1976).

claims differs. On the sex discrimination claim, the district court held that because no difference existed between the federal and D.C. parole standards the fact that all women, regardless of the site of incarceration, were paroled under the D.C. standards was irrelevant. On the claim alleging different treatment for male D.C.Code offenders in federal and local facilities, the court held that regardless of the different treatment equal protection is not violated. We note that although inmates do have an equal protection right not to be subjected to discriminatory sentencing practices or to be assigned to a federal or local facility in a discriminatory manner, no showing was made here that the manner in which inmates are assigned to federal or local facilities or the differences between the federal and D.C. standards, if they do exist, are not justified by legitimate local interests. Thus, while interpreting section 24–209 to allow the federal Commission to apply federal parole standards to D.C.Code offenders might well raise serious equal protection questions, we are unable either to determine whether the questions must be reached or to answer them at this stage.[15]

B. *The Task of the District Court on Remand*

■ We therefore reverse the district court's grant of summary judgment for the United States and remand this case for further proceedings, should the parties wish to continue. We note that because of the premature initial decision, much of this case remains unresolved. The district court did not rule on the plaintiffs' motion for class certification or on their motion to amend their complaint.

15. The plaintiffs also argue that application of the federal parole standards to D.C.Code offenders operates as an unconstitutional *ex post facto* change in their punishment. We recently have rejected just such a challenge, on the theory that an offender sentenced to an indefinite term has no vested right that parole authorities continue to exercise their discretion in the manner employed at the time of sentencing. *Warren v. United States Parole Comm'n*, 659 F.2d 183, 197 (D.C.Cir.1981).

1. I agree with the majority that *Warren v. United States Parole Comm'n*, 659 F.2d 183

Moreover, the record did not explore crucial factual issues. The important threshold question of whether the federal and the District of Columbia parole suitability standards are in fact different cannot be resolved from the present record. Nor does the record yet permit resolution of the difficult question of what, if any, legitimate governmental interests would be served by the application of federal parole standards to D.C.Code offenders in federal custody as opposed to women offenders or D.C.Code offenders in local custody. The parties must be given the opportunity to probe these, and perhaps other, questions pertinent to final determination of the scope of federal parole authority over D.C.Code offenders in federal custody.

The legal questions potentially posed by this case are complicated. Plaintiffs seek to procure a determination of fundamental constitutional rights. Before any of these questions can be faced or resolved, there must be a factual underlay not now present. We therefore reverse and remand.

*So ordered.*

BORK, Circuit Judge, concurring in part and dissenting in part:

The majority holds that we have jurisdiction to hear this appeal, that appellants' ex post facto clause challenge is meritless, and that the record as it now stands is inadequate to decide either the statutory or equal protection issues. Accordingly, the majority remands the case to the district court for additional evidence. I agree with the first two holdings.[1] From the third holding, I

(D.C.Cir.1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982), disposes of the ex post facto clause challenge. I also agree with the majority that, because the March 31 grant of summary judgment was in fact a final judgment for the entire case, the April 10 motion, styled a motion for clarification under Fed.R.Civ.P. 60(b), was in fact a motion to amend the judgment under Fed.R.Civ.P. 59(e), the requested amendment being the preservation of the sex discrimination claim. The April 10 motion therefore tolled the running of the sixty day period for appeals, and appellants' notice of appeal was timely.

must respectfully dissent. In my view, no further factual development of the record is needed to see that, with the single exception of the sex discrimination claim, appellants' statutory and equal protection claims are meritless. I would therefore remand solely on the sex discrimination claim.

### THE STATUTORY CLAIM

Appellants claim that D.C.Code § 24–209 (1981) forbids the disparate treatment of D.C. offenders on the basis of their place of incarceration—D.C. prisons or federal prisons. The majority declines to answer the question, remanding instead for a determination whether there is in fact disparate treatment. In my view, a trial is wholly unnecessary since the various sources for determining legislative intent—the language of the statute, its legislative history, its historical background, and its construction by the agency entrusted with its enforcement, see Howe v. Smith, 452 U.S. 473, 480–87, 101 S.Ct. 2468, 2473–77, 69 L.Ed.2d 171 (1981)—make clear that section 24–209 was not intended to prohibit the challenged disparate treatment.

Of the relevant sources for determining legislative intent, none supports appellants. The language of the provision, as the majority observes, excludes neither appellants' nor appellees' interpretation. The United States Parole Commission and the Attorney General are charged with enforcing section 24–209 in cases such as this; appellants have shown nothing to suggest that they have not consistently read the provision to permit application of federal parole standards to District offenders in federal prisons.[2] A review of the historical background and legislative history of the statute, which must be the primary sources of illumination

in this case, demonstrates that appellees' construction is the only one that makes sense as a conclusion about legislative intent.

Until the very end of the nineteenth century, no federal prisons existed, and federal prisoners were housed in state facilities. See Howe v. Smith, 452 U.S. at 483, 101 S.Ct. at 2475. The Supreme Court endorsed this practice. Ex parte Karstendick, 93 U.S. 396, 400, 23 L.Ed. 889 (1876).[3] Beginning in 1789, the federal government asked the states to confine federal prisoners in their own prisons at the federal government's expense. Act of Sept. 23, 1789, 1 Stat. 96. Some states complied with this request. See McNutt v. Bland, 43 U.S. 9, 16, 2 How. 9, 16, 11 L.Ed. 159, modified, 43 U.S. 28, 2 How. 28, (1844) (discussing Mississippi statute); Randolph v. Donaldson, 13 U.S. 76, 84, 9 Cranch 76, 84, 3 L.Ed. 662 (1815) (discussing Virginia statute). In those states unwilling to accept federal prisoners, the First Congress and later Congresses permitted the federal marshal, under the direction of the federal district judge, to "hire a convenient place to serve as a temporary jail" until permanent arrangements could be made. Act of Mar. 3, 1791, 1 Stat. 225; Act of Mar. 3, 1821, 3 Stat. 646; Act of Mar. 2, 1833, ch. 57, § 6, 4 Stat. 632, 634. See Randolph v. Donaldson, 13 U.S. at 49, 9 Cranch at 84 (discussing 1791 Act).

Initially, federal courts were empowered by Congress to assign federal prisoners to individual prisons. Federal courts could sentence federal prisoners to any willing state prison in the state of conviction, inside or outside the district in which the court sat. Act of Mar. 3, 1825, ch. 65, § 15, 4

---

**2.** As the majority points out, before 1976 there was little occasion for litigation or formal policy announcements on the issue in this case. *See* Majority Opinion at 1129.

**3.** It is conceded that Congress has the power to provide that persons convicted of crimes against the United States in one State may be imprisoned in another. Congress can cause a prison to be erected at any place within the jurisdiction of the United States, and direct that all persons sentenced to imprisonment

under the laws of the United States shall be confined there; or it may arrange with a single State for the use of its prisons, and require the courts of the United States to execute their sentences of imprisonment in them. All this is left to the discretion of the legislative department of the government, and is beyond the control of the courts. *Ex parte Karstendick,* 93 U.S. 396, 400, 23 L.Ed. 889 (1876).

Stat. 115, 118; Act of Mar. 3, 1835, ch. 40, § 5, 4 Stat. 775, 777; Act of Mar. 28, 1856, ch. 9, 11 Stat. 2; Act of Mar. 3, 1865, ch. 86, 13 Stat. 500. During the Civil War, Congress authorized the Secretary of the Interior, in addition to federal courts, to assign federal prisoners to state prisons. Act of May 12, 1864, ch. 85, §§ 1 & 2, 13 Stat. 74, 74–75 (adult prisoners); Act of Mar. 3, 1865, ch. 121, §§ 1 & 2, 13 Stat. 538, 538 (juvenile offenders). A few years later, Congress gave the Attorney General broad authority to assign federal prisoners to any suitable jail or prison. Act of Mar. 5, 1872, ch. 30, § 1, 17 Stat. 35, 35; Act of July 12, 1876, ch. 183, 19 Stat. 88. The Supreme Court took note of the Attorney General's broad authority and held that a federal prisoner cannot object to the Attorney General's assignment. *Ex parte Karstendick,* 93 U.S. at 400–01;[4] *see United States v. Marshall,* 17 D.C. (6 Mackey) 34, 37 (1887). *See also Ex parte Waterman,* 33 F. 29, 29–31 (N.D.N.Y. 1887) (transfer of prisoner by Attorney General can be done ex parte).

States that received federal prisoners were authorized by Congress to confine them for exactly the length of their sentence. In particular, state prison officials had no power, absent specific Congressional authorization, to release federal prisoners before the expiration of their term. *See McNutt v. Bland,* 43 U.S. at 8–10, 2 How. at 16–18. Otherwise, state officials had broad authority over federal prisoners. Indeed, federal law provided that

whenever any criminal convicted of any offence against the United States, shall be imprisoned, in pursuance of such conviction, and of the sentence thereupon, in the prison or penitentiary of any state or territory, such criminal shall in all respects be subject to the same discipline and treatment, as convicts sentenced by the courts of the state or territory, in which such prison or penitentiary is situated; and while so confined therein, shall also be exclusively under the control of the officers having charge of the same, under the laws of the said state or territory.

Act of June 30, 1834, ch. 163, 4 Stat. 739. *See Mackin v. United States,* 117 U.S. 348, 352, 6 S.Ct. 777, 779, 29 L.Ed. 909 (1886) (discussing 1834 Act); *Ex parte Karstendick,* 93 U.S. at 398, 399 (same).

By the end of the nineteenth century, most federal prisoners were concentrated in a few state prisons. Many states had found their prisons overcrowded with federal prisoners; some states had stopped accepting federal prisoners not convicted in their own state; and one state had refused to accept any federal prisoners at all. H.R.Rep. No. 1341, 61st Cong., 2d Sess. 7 (1910). In 1891, Congress authorized the construction of the first federal penitentiaries, Act of Mar. 3, 1891, ch. 529, 26 Stat. 839, and construction of Leavenworth prison began in 1896. H.R. Rep. No. 1341, *supra,* at 5, 6, 7.

Penal reform in the late nineteenth century encompassed the birth of parole, "a means of restoring offenders who are good social risks to society ... under guidance and control" of a parole board. *Zerbst v. Kidwell,* 304 U.S. 359, 363, 58 S.Ct. 872, 874,

---

4. It is further insisted on behalf of the petitioner, that the legislature of the State of West Virginia has not given its consent to the use of the penitentiary of the State by the United States for the punishment of their criminals, and that for this reason the order for his confinement there is void. The petitioner is actually confined in the penitentiary, and neither the State nor its officers object. Congress has authorized imprisonment, as a punishment for crimes against the United States, in the State prisons. So far as the United States can do so, they have made the penitentiary at Moundsville a penitentiary of the United States, and the State officers having charge of it their agents to enforce the sentences of imprisonment passed by their courts. The question is not now whether that State shall submit to this use of its property by the United States, nor whether these State officers shall be compelled to act as the custodians of those confined there under the authority of the United States, but whether this petitioner can object if they do not. We think he cannot. So long as the State permits him to remain in its prison as the prisoner of the United States, and does not object to his detention by its officers, he is rightfully detained in custody under a sentence lawfully passed.
*Ex parte Karstendick,* 93 U.S. at 404.

82 L.Ed. 1399 (1938). *See* 4 *Attorney General's Survey of Release Procedures* 4 (1939) (*"Attorney General's Survey"*) (defining parole as "the release of an offender from a penal or correctional institution, after he has served a portion of his sentence, under the continued custody of the State and under conditions that permit his reincarceration in the event of misbehavior"). Like the closely allied but later developing practice of indeterminate sentencing, parole reflected the contemporary penological commitment to individualized treatment and was based at least as much on the idea of protecting society from newly released but still dangerous criminals as on the idea of offering rehabilitated offenders an early release. *See* National Commission on Law Observance and Enforcement, Report on Penal Institutions, Probation, and Parole 129–30 (1931) (Wickersham Report).

Informal methods of parole had existed since the New York House of Refuge had adopted an indenture system for juvenile delinquents in 1825. 4 *Attorney General's Survey* at 7. For adult offenders, the first modern attempt to institute a large-scale parole system began in 1876 at New York's Elmira Reformatory. *Id.* at 19. *See The President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Corrections* 60, 185 (1967). Only one year later, the New York legislature adopted the first American parole statute. 1877 N.Y.Laws, ch. 173, § 5. By 1910, thirty-one other states had also adopted parole laws, 4 *Attorney General's Survey* at 20, and Congress had adopted the first federal parole law, Act of June 25, 1910, ch. 387, 36 Stat. 819. 1 *Attorney General's Survey* at 15–16, 786.

Congress enacted the 1910 Federal Parole Act with two goals in mind, one penological, one fiscal. Believing that parole had "come to be recognized as humane, in the interest of sound policy and highly beneficial to the welfare of society," Congress intended federal prison officials to be able to reward rehabilitated prisoners as well as to maintain prison discipline through the incentive of an early release. H.R.Rep. No. 1341, *supra,* at 4. *See id.* at 4–5 (reprinting portions of 1898 American Bar Association report on parole). This policy was considered particularly appropriate for federal prisons because of the smaller number of prisoners who had committed serious offenses. *Id.* at 5 ("About 33 per cent of the prisoners in state penitentiaries are there for the commission of the smaller offenses, while about 57 percent of the prisoners in federal penitentiaries are there for the smaller offenses."). The second, fiscal purpose was to ease overcrowding in the three federal prisons, which were still only partially completed but which would remain overcrowded on completion as they received federal prisoners currently confined in state institutions.

To accomplish its goals in the existing system, the 1910 Act created separate parole systems for federal prisoners confined in federal and state institutions. Section 1 made every federal prisoner confined in a federal prison under a determinate sentence eligible for parole after having served one-third of his total term of incarceration. 1 *Attorney General's Survey* at 16. Section 2 created a separate parole board for each of the three federal prisons, and section 3 granted the boards the power to grant or revoke parole, subject to the approval of the Attorney General. 1 *Attorney General's Survey* at 16. Section 3 required the parole boards, in making parole decisions, to consider (1) whether "there is a reasonable probability" that the prisoner "will live and remain at liberty without violating the laws" and (2) whether "release is not incompatible with the welfare of society." 36 Stat. 819. Application of these nebulous standards by three separate federal parole boards undoubtedly led to disparate courses of decision in the three federal prisons. The Act left each parole board free to decide whether to release federal prisoners and what conditions of parole to prescribe. "The Board, under the law, establishes its own rules and regulations governing procedure, subject, of course, to the approval of the Attorney General," and aside from the two factors the Act required these boards to consider, "[a]ll other rules governing the condition of parole are left to the discretion

of the Board and are promulgated in the rules laid down by them concerning their action and the conditions under which prisoners are released." White, *The Federal Parole Law,* 12 A.B.A.J. 51, 51 (1926) (L.C. White, Superintendent of Federal Prisons).

By contrast, the Act left federal prisoners confined in state prisons subject to state parole laws. Section 9 made such federal prisoners "eligible to parole on the same terms and conditions and by the same authority and subject to recommittal for violation of such parole in the same manner" as state prisoners. 36 Stat. 821; *see* H.R. Rep. No. 1341, *supra,* at 3; White, *supra,* 12 A.B.A.J. at 52. Section 9 explicitly adopted the state law for each federal prisoner confined in a state prison or reformatory. The only qualification was that all paroles for such prisoners were subject to the approval of the Attorney General. H.R.Rep. No. 1341, *supra,* at 3; White, *supra,* 12 A.B.A.J. at 52.[5]

It is against this background of federal prison practices that District of Columbia law and practices must be understood. Until 1932, District of Columbia prisoners were subject to the jurisdiction of the federal parole system, and "the history of parole in the District of Columbia prior to 1932 is substantially that of the federal parole system." 1 *Attorney General's Survey* at 232 (footnote omitted). In particular, District prisoners confined in the District penal and reformatory institutions were considered for parole under the 1910 Federal Parole Act. *Id.* In 1932, Congress changed that situation by passing a statute entitled "An Act to establish a Board of Indeterminate Sentence and Parole for the District of Co-

lumbia and to determine its functions, and for other purposes." Act of July 15, 1932, ch. 492, 47 Stat. 696 (currently codified at D.C.Code § 24–201a *et seq.* (1981)) (the "District Parole Act"). The 1932 District Parole Act created a separate, local Board of Indeterminate Sentence and Parole to alleviate the burden placed on the Federal Parole Board by the need to make parole decisions for District as well as federal prisoners. H.R.Rep. No. 881, 72 Cong., 1st Sess. 2 (1932); S.Rep. No. 450, 72d Cong., 1st Sess. 2–3 (1932); *see* J. Nolan, *One Hundred Prisoners: A Study of the Operation of Parole in the District of Columbia* xxxiii (1936). *See also* H.R.Rep. No. 1341, *supra,* at 6 ("About 20 per cent of the prisoners at Leavenworth and Atlanta [as of 1910] are sent from the District of Columbia for violation of the laws of the District.").

The local Board of Indeterminate Sentence and Parole was authorized to parole prisoners held in District custody after making the same two inquiries as the 1910 Federal Parole Act required federal parole authorities to make. The discretion exercised by the District Board was also similar to that of the Federal Board. The members of the District Board, noted one contemporary observer, had "the license to make their own rules and regulations, and to determine the policies the board will follow." J. Nolan, *supra,* at 67. *Compare* White, *supra,* 12 A.B.A.J. at 51, *quoted at* pp. 1137–1138 *supra.* In practice, the Board considered a variety of factors in deciding whether to release a prisoner—among them, the prisoner's physical condition, his opportunity for employment, his institution-

---

5.    SEC. 9. That whenever any person has been convicted of any offense against the United States which is punishable by imprisonment, and has been sentenced to imprisonment and is confined therefor, in any reformatory institution of any State in accordance with section fifty-five hundred and forty-eight of the Revised Statutes, or other laws of the United States, then if such State has laws for the parole of prisoners committed to such institutions by the courts of that State, such person convicted of any offense against the United States shall be eligible to parole on the same terms and conditions and by the

same authority and subject to recommittal for violation of such parole in the same manner, as persons committed to such institutions by the courts of said State, and the laws of said State relating to the parole of prisoners and the supervision thereof in such institutions are hereby adopted and made to apply to persons committed to such institutions for offense against the United States.... No such prisoner shall be entitled to go on parole until the Attorney-General shall have approved the order therefor ....

36 Stat. 821.

al behavior, his likely response to parole supervision, his likely behavior after release, his prior criminal record, public opinion, and public safety. *See* J. Nolan, *supra,* at 53–77.

There were three important differences between the federal and District parole systems in 1932. The first and most obvious one was geographic. The Federal Parole Board had nationwide authority over all prisoners confined in federal prisons. The District Board had authority only over prisoners in District custody. Second, federal parole authorities had jurisdiction only over federal prisoners serving definite terms of imprisonment or life terms. *See* White, *supra,* 12 A.B.A.J. at 51. As indeterminate sentencing did not exist at that time for federal offenders, all federal prison terms fit into one of these two categories. *See* 4 *Attorney General's Survey* at 20 & n.41. The District Parole Board, unlike its federal counterpart, had jurisdiction over prisoners serving indeterminate terms, since as a result of the 1932 District Parole Act, all District offenders received indeterminate sentences—minimum and maximum terms of confinement set by the sentencing judge, with the District parole authorities determining the actual period of incarceration. H.R.Rep. No. 881, *supra,* at 2–3; S.Rep. No. 450, *supra,* at 3. Third, prisoners confined in federal institutions became eligible for parole after serving one-third of their total term of incarceration. District prisoners confined in District custody became eligible for parole after serving only one-fifth of their total term. S.Rep. No. 450, *supra,* at 3; 75 Cong.Rec. 15,035–37 (1932) (remarks of Rep. Black).[6] The 1932 Act thus created three important differences in the treatment of prisoners in federal custody and those in District custody. Nothing in the Act, however, modified the different parole treatment federal prisoners received in state custody.

The statute at issue in this litigation, section 24–209 of the current District of Columbia Code, was not part of the original District Parole Act. It was added as an amendment in 1934. The amendment granted federal authorities "the same power and authority" over District prisoners in their custody as the District Board would have if these prisoners were in District custody. The legislative history of this amendment is sparse: it consists primarily of a letter from M.C. Hazen to the Senate and House Committees on the District of Columbia, a letter that, with a few introductory remarks, makes up the entire Senate and House Reports. *See* S.Rep. No. 674, 73d Cong., 2d Sess. 1–2 (1934) (reprinting letter); H.R.Rep. No. 1446, 73d Cong., 2d Sess. 1–2 (1934) (same). Hazen wrote that the Commissioners of the District had submitted the proposed amendment in order to rectify a problem existing at Lorton, the District reformatory for juvenile offenders. When Congress enacted the District Parole Act in 1932, according to Hazen, "it was the intention to erect a penitentiary upon a portion of the site occupied by the reformatory at Lorton, Va., in which to confine hardened criminals for whom the conditions at the reformatory were unsuitable." H.R. Rep. No. 1446, *supra,* at 1–2 (Hazen). *See* J. Nolan, *supra,* at xxviii.[7] When that project was later abandoned for lack of money, it became necessary to transfer District prisoners to federal prisons. This transfer created a problem: the Federal Parole Board had jurisdiction to parole inmates only if they were serving definite terms of incarceration or life sentences, but all District offenders were given indeterminate sentences. H.R.Rep. No. 1446, *supra,* at 2. The Federal Parole Board therefore had no power to release District prisoners even though Congress had contemplated, in

---

6. Congress was well aware of this difference between federal and District law when it enacted the 1932 District Parole Act. *See* 75 Cong. Rec. 15,035, 15,036–37 (1932) (remarks of Rep. Black on floor, pointing out the difference).

7. Congress ordered the construction of a separate reformatory and a "workhouse" for the

District as part of the District of Columbia Appropriations Act of 1909. Act of Mar. 3, 1909, ch. 250, 35 Stat. 688, 717. *See* H.R.Rep. No. 2276, 60th Cong., 2d Sess. 13, 19 (1909) (authorizing funding for separate facilities); S.Rep. No. 897, 60th Cong., 2d Sess. 3 (1909) (same).

passing the 1932 District Parole Act, that District offenders would be eligible for parole. The amendment Hazen proposed was necessary to ensure that the Federal Parole Board had authority to parole District offenders who were transferred to federal prisons. *Id.*

On April 25, the Senate passed the amendment without debate and sent it to the House. 78 Cong.Rec. 7276 (1934). The House approved its own version of the Senate bill without debate on May 28. 78 Cong.Rec. 9724 (1934). Representative Jenckes was the only person to comment upon the House bill. He offered these comments:

> Briefly summed up this measure permits the authorities at Lorton to transfer hardened criminals or unruly convicts to other Federal prisons. In this manner the objective of Lorton can be maintained.

78 Cong.Rec. 9745 (1934). After praising the superintendent of prisons, Rep. Jenckes went on:

> I believe that the objectives and ideals of the Lorton institution should have the full and sympathetic support of the Congress, and I hope that my colleagues will enact this measure without delay, as it will increase the efficiency of one of America's penal institutions.

*Id.* On May 31, the House unanimously voted to substitute the Senate version for its bill. 78 Cong.Rec. 10,137 (1934). The bill was then presented to President Roosevelt who signed it into law on June 5. 78 Cong.Rec. 10,769 (1934).

In light of the historical background set out above, the 1934 amendment to the District Parole Act must be read as having had a very limited purpose. Congress was fully aware that United States prisoners could be confined in institutions under three separate jurisdictions (federal, District, or state), that the Attorney General had the authority to transfer United States prisoners across jurisdictional lines, and that a prisoner's eligibility for parole was governed by the rules of the jurisdiction having custody over him. Under existing law, federal prisoners could be subject to any one of three different types of parole systems, and to any of a much larger number of particular systems: at least 32 states had adopted parole by this time. (In addition, prior to the consolidation of federal parole authority in 1930, federal prisoners in federal custody could be subject to any of the different parole release standards for the several federal prisons.) Congress assumed that transferring a prisoner from one jurisdiction to another subjected that prisoner to the standards and authority of the parole board of the receiving jurisdiction. If, as appellants argue, the purpose of the 1934 amendment was to make the Federal Parole Board an agent of the District Board, Congress would surely have noted that the problem of parole standards depending on location of confinement was not restricted to the class of District offenders in federal prisons. Congress might even have altered the Attorney General's plenary transferring authority. But Congress did no such thing.

Other than the 1932 Act, Congress modified none of the statutes that gave rise to different standards for release. Nothing in the language or legislative history of the 1934 amendment even indicates Congressional awareness of any fairness issue raised by the transfer problem. There is simply no basis for believing that in enacting the 1934 amendment Congress was making a radical departure from its long and consistent practice of permitting parole standards to vary from custodial jurisdiction to custodial jurisdiction without regard to the jurisdiction of conviction. Rather, the only plausible construction of the statute is that it was designed to return to the Federal Parole Board a part of its jurisdiction that had been eliminated by the indeterminate sentencing provisions of the 1932 Act. Thus, the 1934 amendment simply ensured that a particular change in custody did not result in the denial of any opportunity for parole altogether. Indeed, it did not even do quite that: by leaving intact the Attorney General's authority to transfer a District prisoner from a federal prison to a state institution—an authority ratified

by Congress in 1930, Act of May 14, 1930, ch. 274, § 4, 46 Stat. 325, 326; *see* S.Rep. No. 533, 71st Cong., 2d Sess. 1, 3 (1930); H.R.Rep. No. 106, 71st Cong., 2d Sess. 3 (1930)—the 1934 amendment guaranteed only that a District prisoner would be eligible for release on parole if he remained in federal custody, for the state law applicable to prisoners in state custody might not provide for parole.

Appellants offer an alternative interpretation of section 24–209. They argue that Congress adopted the provision in order to reverse the decision of the Fifth Circuit in *Lee v. Aderhold,* 5 F.Supp. 950 (N.D.Ga. 1933), *rev'd,* 68 F.2d 824 (5th Cir.), *cert. denied,* 292 U.S. 633, 54 S.Ct. 718, 78 L.Ed. 1486 (1934). The Fifth Circuit held in that case that District prisoners confined in federal prisons could be considered for parole under federal, not District, guidelines, and it rejected a prisoner's argument that this disparity violated the equal protection clause. *Aderhold v. Lee,* 68 F.2d at 825.[8] The majority suggests, but does not conclude, that this interpretation of section 24–209 is correct. Majority op. 1138. I believe that it is unsupportable.

The legislative history is totally silent on the existing disparities in the parole laws created by the 1910 Federal Parole Act and the 1932 District Parole Act. M.C. Hazen,

the proponent of section 24–209, did not refer to these disparities or to *Aderhold* at all in his letter to the Senate and House Committees on the District of Columbia. S.Rep. No. 674, *supra,* at 1–2 (reprinting letter); H.R.Rep. No. 1446, *supra,* at 1–2 (reprinting letter). Neither the Senate Report nor the House Report nor Representative Jenckes—the only sources of legislative history for the provision—commented on these disparities or on the *Aderhold* decision. *See* pp. 1139–1140 *supra.* There is no basis whatsoever for the conclusion that Congress intended to overrule the decision in *Aderhold:* it is nowhere mentioned in the legislative history, and indeed there is no evidence that Congress was even aware of it.[9]

On other occasions, Congress has clearly manifested its intention to overturn a decision, even in the field of parole law, with which it has disagreed. For example, when Congress enacted the Act of Oct. 26, 1974, Pub.L. No. 93–481, § 2, 88 Stat. 1455, overruling *Warden v. Marrero,* 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974) (repeal of statute that denied parole to certain narcotics offenders did not make previously convicted drug offenders eligible for parole), the legislative history expressly indicated the intent to overrule the case. H.R.Rep. No. 1442, 93d Cong., 2d Sess. 6–7 (1974); H.R.Rep. No. 1248, 93d Cong., 2d Sess. 8

---

**8.** In *Aderhold,* a District prisoner confined in federal prison claimed that he was entitled to be considered for parole after serving only one-fifth of his total term of incarceration, as provided by the 1932 District Parole Act, rather than after serving one-third of his term, as provided by the 1910 Federal Parole Act. The failure to consider him for release under the District Parole Act, he alleged, violated the equal protection clause. The district court agreed and ordered the Attorney General to transfer Lee to the District authorities. 5 F.Supp. at 951–52. On appeal, the Fifth Circuit reversed, concluding that "[i]t is beyond question that the authority of the new board [created by the District Parole Act] and the system of parole which it was to supervise were confined to the penal institutions in the District of Columbia, and only persons therein confined were to be affected. Prisoners elsewhere remain as they were." 68 F.2d at 825. The court also summarily disposed of Lee's equal protection claim: "No provision of the Constitution requires Congress to make any parole provisions

at all, nor to make the same ones for all penal institutions or for all prisoners, although of course the provisions made ought to be fairly and equally administered." *Id.*

**9.** *Cf. Milhouse v. Levi,* 179 U.S.App.D.C. 1, 548 F.2d 357, 363 (1976) ("Congress, in enacting both the Court Reform Act and the Home Rule Act, did not amend any of the provisions under which the Attorney General has regulated the furlough programs at the Lorton Reformatory. In light of the longstanding practice in this regard, any assumption that failure to amend was due to inadvertence as distinguished from design would be to ignore the meticulous care Congress exhibited in conforming other statutory provisions to its legislative scheme for the District of Columbia. In short, if Congress had intended to alter the nature of the Attorney General's control over the Lorton furlough program, same could have been done by express provision.") (footnote omitted).

(1974), U.S.Code Cong. & Admin.News 1974, p. 5971. It is impossible to believe that if so short a statute as section 24–209 had so clear a purpose as to overrule *Aderhold*[10] the legislative history would nowhere have mentioned the case. Indeed, assuming that Congress was aware of *Aderhold,* its failure to mention the case, when enacting a statute that is at best ambiguous on the issue decided in the case, might more easily be read as an approval of the holding than as a disapproval of it. *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 380–89 & nn. 65–66, 102 S.Ct. 1825, 1840–44 & nn. 65–66, 72 L.Ed.2d 182 (1982) (Congress's recognition of judicial decisions implying a private right of action under the federal commodities trading laws in an amendment to those laws constitutes Congressional acceptance of those interpretations as correct).

If section 24–209 did not expressly repeal the Federal Parole Board's authority to apply its own standards, neither did it do so by implication. As a general rule, "repeals by implication are not favored," *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936), and "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290

(1974). Section 24–209, as shown above, is readily reconcilable—indeed, is *best* read as being perfectly consistent with—the existing federal and District parole laws. The provision therefore cannot be read as repealing these laws by implication.

Appellants also seek support for their interpretation in *Bracey v. Hill,* 11 F.Supp. 148 (M.D.Pa.), *aff'd,* 77 F.2d 970 (3d Cir. 1935). In that case, a District prisoner transferred to a federal penitentiary in Georgia contended that he could not be transferred to a prison outside of the District of Columbia because he had been prosecuted, convicted, and sentenced under the District penal code. 11 F.Supp. at 149. The Court rejected the contention.

The only statement in *Bracey* that supports appellants is the statement that section 24–209 was enacted "[p]robably as a result of" *Aderhold,* a statement that cannot fairly be read as anything more than conjecture. 11 F.Supp. at 149. The *Bracey* court examined none of the background or legislative history of the section and cited no support for this guess at its origin. The remainder of *Bracey,* to the extent it is relevant, actually undermines appellants' argument because it recognizes the authority of the Federal Parole Board over District prisoners once they had been transferred from the District to a federal institution.[11]

---

**10.** *Aderhold* had not yet even become final at the time Hazen wrote to the Senate and House Committees, or at the time the Senate Committee approved his proposal. It was still pending before the Supreme Court on a petition for certiorari. *Compare Lee v. Aderhold,* 292 U.S. 633, 54 S.Ct. 718, 78 L.Ed. 1486 (1934) (petition denied on April 30) *with* Letter from M.C. Hazen to Senator King, *reprinted at* S.Rep. No. 674, *supra,* at 1–2 (letter dated April 4) *and* S.Rep. No. 674, *supra,* at 1 (report printed on April 9).

**11.** The *Bracey* court said:

Prior to the passage of the Indeterminate Sentence and Parole Act, there was no question as to the power of the Attorney General to designate any federal penitentiary outside of the District of Columbia for prisoners convicted of felony in the District of Columbia.... With the passage of [that Act], it was provided that felony sentences in the courts of the District of Columbia be indeterminate and subject to the parole provisions

of that act. Since the power of the board of parole created under that act did not extend beyond the District of Columbia and prisoners transferred to institutions outside of the District were subject to the general board of parole which was not authorized to act in cases of parole under the [District Act], it might be inferred that defendants sentenced under [that Act] could not be validly committed to penal institutions outside of the District of Columbia. This question was raised in the [*Aderhold*] case .... Probably as a result of that case, the [District Parole Act] was amended on June 5, 1934, ....

....

Thus the same privileges of parole are accorded to prisoners sentenced in the District of Columbia and committed to penal institutions outside of the District as to those sentenced and confined within the District. The amendment therefore removes the question whether a defendant, who was sentenced in the District of Columbia, could be committed

In any event, *Bracey's* comments on the 1934 statute were unnecessary to its decision. By confusing the Attorney General's authority to *transfer custody* of District prisoners with the Federal Parole Board's *jurisdiction* to *release* District prisoners, *Bracey* misinterpreted the 1934 amendment. That amendment was irrelevant to *Bracey's* claim, which challenged only the authority of the Attorney General to effect his transfer from the District of Columbia to Georgia. That claim had been meritless since *Ex parte Karstendick,* 93 U.S. at 404, and was not given life by either the 1932 District Parole Act or the 1934 amendment to that Act.[12]

### The Equal Protection Claims

Appellants challenge the application of federal parole standards to them on two grounds under the due process clause of the Fifth Amendment. Their first claim—that equal protection is denied by treating District offenders held in District custody under allegedly easier parole standards than are applied to appellants as District offenders held in federal custody—is without merit as a matter of law. No point will be served, therefore, by the trial the majority requires on remand.

In *Koyce v. United States Board of Parole,* 113 U.S.App.D.C. 152, 306 F.2d 759 (1962), this court rejected an equal protection argument indistinguishable from that made by appellants. The discrimination alleged was that military prisoners released from civilian federal prisons were subjected to parole requirements not imposed upon military prisoners released from military prisons. *Id.* at 762. The court held that, "[i]n determining whether [a prisoner] is

being denied equal protection of the laws the class to which he belongs consists of the persons confined as he was confined, subject to the same conditions to which he was subject." *Id.* The court summarily disposed of the equal protection claim, first, by recognizing that Congress had validly determined that it was "desirable and feasible" for all persons confined in the same federal institution to be subject to the same release conditions and, second, by expressly adopting the "reasoning and conclusion" of the Fifth Circuit Court of Appeals in *Bates v. Wilkinson,* 267 F.2d 779 (5th Cir.1959). This court's express adoption of *Bates's* reasoning is significant for this case because *Bates,* in rejecting the same equal protection challenge as that made in *Koyce,* relied almost exclusively on its earlier decision in *Aderhold v. Lee,* 68 F.2d 824, and on *Ex parte Karstendick,* 93 U.S. 396, 23 L.Ed. 889. *Aderhold* had rejected the equal protection claim made here by appellants.

Appellants' first equal protection claim is thus foreclosed by an earlier decision of this court. Even if the issue were open, however, the claim should be dismissed. A discrimination based on place of custody must be upheld if it meets the rationality standard of equal protection review. That is made clear not only by *Koyce* but by the more recent Supreme Court case of *McGinnis v. Royster,* 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973). In *McGinnis,* the Court rejected an equal protection challenge to a part of New York's parole scheme. "The determination of an optimal time for parole eligibility," said the Court, "elicited multiple legislative classifications and groupings, which the court below rightly concluded require only some rational ba-

---

to a penal institution outside of the District because of the deprivation of parole. The authority of the Attorney General to transfer prisoners from the District of Columbia to other penal institutions has existed and has been recognized for a long time prior to the [District Parole Act]. This act, as amended, is not inconsistent therewith, but in fact recognizes and aids the exercise of that authority.

*Bracey v. Hill,* 11 F.Supp. at 149 (citations omitted).

12. Congress has never amended section 24–209, though it has revised the parole laws, *e.g.,* Act of June 25, 1948, ch. 645, § 4202, 62 Stat. 683, 854 (making federal prisoners in state prisons eligible for federal parole); Parole Commission and Reorganization Act, Pub.L. No. 94–233, 90 Stat. 219 (1976), and though some of the changes adopted in the 1948 revision of the federal criminal laws applied to the District, *e.g.,* Act of June 25, 1948, ch. 645, § 5001, 62 Stat. 683, 857 (District covered by provision regarding surrender of youthful offenders).

sis to sustain them." The Court explained further: "We do not wish to inhibit state experimental classifications in a practical and troublesome area, but inquire only whether the challenged distinction rationally furthers some legitimate, articulated state purpose." *Id.* at 270, 93 S.Ct. at 1059. The Court found the New York scheme lawful because it rationally tied parole eligibility to the need and opportunities for rehabilitation of prisoners in different institutions.

The distinction appellants challenge here easily satisfies the rationality requirement. For most of our history, Congress has subjected prisoners to the parole standards of the jurisdiction operating the prison of confinement. That fact is itself legally significant. " 'If a thing has been practiced for two hundred years by common consent, it will need a strong case' to overturn it." *Schick v. Reed,* 419 U.S. 256, 266, 95 S.Ct. 379, 385, 42 L.Ed.2d 430 (1974) (quoting *Jackman v. Rosenbaum Co.,* 260 U.S. 22, 31, 43 S.Ct. 9, 10, 67 L.Ed. 107 (1922) (Holmes, J.)).

The nature of a parole is significant as well. Parole, like confinement in any particular prison, is neither a constitutional or statutory right nor an intrinsic part of the sentence received on conviction. Rather, it is a matter committed by Congress to the discretion of the Executive Branch (as constrained by statute) to adopt measures for the effective administration of prisons, for the execution of just punishment, for the protection of the public, and for the rehabilitation of offenders. *See Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 463–64, 101 S.Ct. 2460, 2463–64, 69 L.Ed.2d 158 (1981); *Greenholtz v. Inmates of the Nebraska Penal and Correction Com-*

*plex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979); *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Warren v. United States Parole Commission,* 659 F.2d 183, 189–97 (D.C.Cir. 1981). As this court recognized in *Koyce,* Congress could rationally conclude that prisons should be managed largely on a prison-by-prison basis, allowing broad authority within each prison to set its own rules. Uniformity of parole standards within a prison might well be adopted as an important tool of prison management. Congress could rationally conclude that it would be deleterious to prisoner morale, discipline, and rehabilitation if persons confined within the same prison, perhaps within the same cell, were subject to different standards for release on parole.

In the area of parole practices, "few certainties exist." *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. at 8, 99 S.Ct. at 2104. It is an area of experimentation, and actual practices reflect the accommodation of many policies. The rationality of the scheme challenged here thus would not be undermined even if appellants could show, as they have alleged, that appellees do not rigidly adhere to a policy of uniformity of parole standards within each prison. In particular, that the same policy may not be applied to women prisoners [13] might well reflect a reasonable relaxation of the uniformity policy in order to accommodate another goal, that of according female District offenders parole treatment comparable to that received by most male District offenders. *See* pp. 1145–1146 *infra.* Moreover, even if state offenders in federal custody receive parole consideration by state authorities, as appellants allege,[14] that prac-

---

13. A report submitted by appellants suggests, however, that virtually all the female District offenders are confined in a single federal prison and in practice receive parole consideration under the standards applicable there. *See* L. Steinitz, The *Garnes* Decree in Reality: Parole Eligibility and Determination for D.C. Women in Federal Correctional Institutions (1981), Appendix for Appellants at 124.

14. Appellants have provided no legal or factual support for their allegation sufficient to warrant denial of appellees' summary judgment motion on the rationality issue. Appellants have not even suggested, by affidavit or otherwise, what policies determine when federal prisons accept state offenders, how many such prisoners there are, or what parole treatment they actually receive. Nor have they provided adequate information on what parole treatment

tice would likewise not undermine the rationality of the scheme challenged here: the practice might reflect the special circumstances under which federal prisons take custody of state offenders or federal government respect of state sovereignty or other valid policies.

In sum, "there are plausible reasons for Congress' action" here, and it is " 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.' " *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980) (quoting *Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435 (1960)). Because "the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one[,] . . . [s]uch action by a legislature is presumed to be valid." *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (footnote omitted). Appellants have shown nothing that casts doubt on the rationality of Congress's tying parole standards for District offenders to place of custody, and hence that practice is valid.

*United States v. Thompson,* 147 U.S.App. D.C. 1, 452 F.2d 1333 (1971), does not suggest a contrary conclusion or a higher standard of review. The court there said that equal protection would be denied by application to persons charged with criminal violations of federal law in the District of Columbia of a higher bail standard than was applied to persons charged with the same crime in federal courts outside the District. That difference, according to the court, would carve out a special exception for the District from an otherwise uniform national law. The court found no rational basis for the exception. It stated that, in any event, more than mere rationality would be required to uphold the difference, both because a fundamental liberty interest was involved and because the scheme discriminated against the District of Columbia, which, having no representation in Congress, is deprived of the usual political check on discriminatory treatment.

state offenders in federal custody are legally

Section 24–209 of the D.C.Code, construed to permit application of federal parole standards to persons convicted of local District crimes who are confined in federal prisons, has none of the characteristics that give rise to constitutional problems, and to special scrutiny, in *Thompson.* First, the statute does not make a special exception for the District from an otherwise uniform national law; rather, it is part of a uniform, and rational, national scheme that generally treats prisoners in federal custody according to federal parole rules. Second, the discrimination challenged here is not against District residents, not, that is, between persons outside the District and those within; rather, it is between two classes of persons convicted in the District, between local offenders in local custody and local offenders in federal custody. Section 24–209 thus is like any law governing the District that classifies and therefore does not call forth *Thompson's* suspicion of discrimination against a class unrepresented in the legislature. Finally, the fundamental liberty interest in *Thompson* is that of someone whose conviction may be reversed on appeal. Here, by contrast, the validity of the criminal conviction is not at issue, and whatever rights appellants may have regarding parole are fully respected by a rationality standard of review. *McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973).

Appellants' second equal protection claim is that application of federal parole standards to them, as male District offenders in federal custody, unconstitutionally discriminates against them because female District offenders in federal custody are considered for parole by the District parole board under District standards. I conclude that this claim, unlike appellants' other claims, warrants a remand because neither the legal nor the factual issues are sufficiently developed.

The alleged sex differential arises, somewhat ironically, from a consent decree in *Garnes v. Taylor,* Civ. No. 159–72 (D.D.C.

entitled to receive.

Dec. 10, 1976), which sought to end an alleged discrimination in parole standards against female prisoners. The discrimination, if there was one, existed because there are no District prisons for long-term female offenders, all of whom are therefore confined in federal prisons and were subject to federal parole standards. Plaintiffs' theory was that this created gender discrimination. The *Garnes* consent decree provided for treating female District offenders (including U.S.Code violators) like the bulk of male District offenders, those in District custody, and unlike the small number of male District offenders in federal custody. This theory was not ruled upon, and the settlement appears to have been a governmental attempt to aid female prisoners previously disadvantaged because of their sex. It may be odd that the result should be that males in federal prisons, who previously had no valid equal protection argument because of parole standards more stringent than those applied to males in District custody, should acquire an equal protection claim because of an attempt to aid female prisoners. However that may be, the peculiar genesis and structure of the alleged present gender difference in parole treatment would seem to complicate the required constitutional analysis. Appellate decision would be greatly aided by a district court decision on the relevance of this history as well as the proper definition of the classes for equal protection analysis and whether any other justification for the alleged discrimination meets the applicable constitutional standard.

The sex discrimination issue is unclear on factual grounds as well. For appellants to make out their claim, they must, as a first step, prove differential treatment of men and women. The record does not currently contain that showing. Indeed, there is a strong suggestion in the record that, despite the *Garnes* decree, women District offenders are not consistently receiving parole consideration by the District board under District parole standards. *See* L. Steinitz, The *Garnes* Decree in Reality: Parole Eligibility and Determination for D.C. Women in Federal Correctional Institutions (1981),

Appendix for Appellants at 124. In addition, it is not clear whether application of whatever standards are applied has resulted in treatment of men less favorable than that accorded women. At this time, in sum, it is impossible to say whether there is any significant difference in parole standards applied to males and females, let alone whether any difference there may be is unconstitutional. A remand on this issue is therefore necessary.